Patrick Fagan THOMAS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16404.

United States Court of Appeals Eighth Circuit.

July 14, 1960.

Robert J. O'Hanlon, St. Louis, Mo., for appellant; Sorkis J. Webbe and Robert J. O'Hanlon, St. Louis, Mo., on the brief, for appellant.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for appellee; William H. Webster, U. S. Atty., and John A. Newton, St. Louis, Mo., on the brief.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment and sentence of imprisonment for one year, entered on December 17, 1959, upon a jury verdict finding the defendant (appellant) guilty under an information charging that on March 14, 1959, in St. Louis, Missouri, he had in his possession two cases of Vel beauty soap, of a value not in excess of $100, which had been unlawfully taken from an interstate shipment of freight, and which soap he knew had been stolen—a violation of Section 659, Title 18 U.S.C., which makes it a federal offense to have possession of such goods, knowing them to have been stolen.

The only evidence produced at the trial of the defendant was that of the Government. At the close of the Government's evidence, the defendant rested his case. While the admissibility of some of the evidence is challenged by the defendant, particularly that obtained as the result of a search and seizure, no question of the sufficiency of the evidence to sustain the conviction is raised.

The factual situation out of which the case arose, as shown by the record on appeal, is substantially as follows:

On March 10, 1959, a trailer of the Melvin Trucking Company was loaded with Vel soap at a plant of the Colgate Palmolive Peet Company in Indiana and was driven to St. Louis, Missouri. The shipment was consigned to Colgate Palmolive Peet Company, Kansas City, Kansas. The sealed trailer was parked in St. Louis on a truck parking lot of the Eaton Truck Lines on the evening of March 11, 1959. While the trailer was standing there, a young Negro, Reuben Reece, broke the seal on the back of it and stole two cartons of the soap. He took the soap to his home, which was nearby. In the early morning of March 13, 1959, two uncles of Reuben—Albert and Henry Reece—were shown the soap in the house by James Reece, Reuben's father. Albert Reece, one of the uncles, took a bar of the soap to Ell's Confectionery store, located on Broadway, several blocks from the house. The defendant was alone in the front part of the store. Albert showed him the bar of soap and asked if he would buy such soap. The defendant offered to pay five cents a bar, and told Albert to go back and get the soap and bring it down before the defendant's wife got up. "He kind of indicated she was back in the back part of the store asleep." Albert and his brother Henry got the soap, carried it down to Ell's Confectionery, and delivered it to the defendant, who paid Albert, for about 95 bars, $4.65 less a $3.50 bill that Albert owed him, or a net return of $1.15 in cash for the soap stolen by Reuben on March 11.

On March 13, 1959, at about 9 p. m., Reuben Reece and four other Negro boys or young men returned to the trailer, opened it, and stole seven cartons of Vel soap, of which Reuben took two. The afternoon of the next day, Henry Reece took two cartons of the Vel soap to Ell's Confectionery, and sold them to the defendant for $7.50.

On March 17, 1959, Sergeant Kuda, of the St. Louis Police Department, and Special Agent Bailey M. Stanfield, of the Federal Bureau of Investigation, interviewed Henry and Albert Reece, who told the officers that they had sold Vel soap on two occasions to a man named Pat who operated a confectionery—that they sold soap to him on Friday of the preceding week and also on Saturday. They described generally the location of the store. On March 18, 1959, Sergeant Kuda and Special Agent Stanfield went to call on the defendant at the confectionery store at about 1:30 p. m. He was not in the store, but they found him in a nearby restaurant. The Sergeant stepped partly inside the restaurant, holding the door open, and motioned to the defendant—whom he knew and who was seated at a back table—and said he wanted to see him. The defendant came

out, and the Sergeant, when outside of the restaurant, said to the defendant that he wanted to talk to him and they would go over to the confectionery store. There was no objection voiced by the defendant. He went with the Sergeant and Special Agent Stanfield to the store. While standing with the defendant in the store proper, in front of the counter, the Sergeant told the defendant that they "had two colored men under arrest who said that they had sold him some soap." The defendant replied that "he did not buy any soap from any colored people." The Sergeant then told him he was under arrest. Some people were coming into the store, and the Sergeant suggested that the defendant and the officers go back into a back room and talk things over. The defendant made no objection and led the way into the living quarters behind the store. After the defendant had again stated that he bought no soap from colored people, the Sergeant noticed in a closet or hall off the living quarters, an open-mesh sack with two cases of Vel soap in it. The Sergeant picked up the sack of soap, and said, "What about this?" The defendant said, "I want to see my lawyer,"[1] or, "I want to see my lawyer, I have nothing further to say."[2] After the arrest and interview with the defendant, he and the soap were taken to police headquarters.

The defendant had, prior to trial, made a timely motion to suppress the evidence procured by Police and the Federal Bureau of Investigation, but, after a full hearing on the motion, it was denied. It was renewed at the trial, but the evidence was admitted.

On behalf of the defendant, it is contended that the trial court erred in the following respects:

1. In overruling the defendant's motion to suppress all evidence obtained as the result of the search and seizure following his arrest on March 18, 1959.

2. In admitting the testimony of Albert Reece to the effect that, while in the office of the United States Commissioner, the defendant said to Reece that he and his brother would probably get a parole because they had not been in trouble before, but that he had been and would probably "do time" and was going to plead not guilty.

3. In admitting in evidence the statement of Special Agent Stanfield that the defendant, when confronted with the sack of soap, said he wanted to see a lawyer and that he had nothing further to say.

4. In overruling the objection to the evidence of Special Agent Stanfield that, as the defendant, his escort and the seized soap passed through the store, the defendant asked the woman known as Elzie Shelby—who apparently owns the confectionery and is "a friend" of the defendant—to call two well-known lawyers of St. Louis.

5. In overruling defendant's motion for a mistrial during the Government's closing argument because Government counsel said that the Negro boys who stole the soap evidently knew where to sell the stolen merchandise.

6. In instructing the jury, in substance, that they might find the defendant guilty if he either knew or was aware of facts from which he reasonably could have inferred that the property was stolen.

The vital question in this case is whether the District Court erred in refusing to suppress the evidence procured by the officers, who, without a warrant, arrested the defendant, and, without a search warrant, seized the stolen soap discovered in the living quarters in the back part of the confectionery store.

The position of the defendant is that the officers did not go to the confectionery to question him, but to search the premises without a search warrant; that, under the evidence, the arrest actually took

---

1. According to the testimony of Sergeant Kuda.

2. According to the testimony of Special Agent Stanfield, received over objection that "it is a comment on the privilege of the defendant not to make a statement after he is under arrest."

place at the restaurant and could not justify the seizure of the soap in the back room of the confectionery, where it was found; and that, if it be held that he was arrested in the confectionery, the invasion and search of the living quarters was a general search forbidden by the Fourth Amendment.

The trial court, as it had a right to do, accepted at full face value the evidence of the Government in ruling on the motion to suppress. That evidence showed that the officers who took the defendant and the soap from the confectionery store knew that Vel soap had been stolen from an interstate shipment, knew who had stolen it, had apprehended the thieves, and had been told by them or by those who aided them in disposing of the stolen soap that it had been sold to the defendant, describing him and the location of the confectionery store. The trial court, in, refusing to suppress the evidence obtained by the officers, obviously concluded that they had probable cause for believing that the defendant had received the stolen soap which he had purchased from Albert and Henry Reece, that he knew it had been stolen, that his arrest without a warrant was therefore valid, and that the discovery and seizure of the stolen soap were also valid as incidental to a lawful arrest. The trial court, we think, did not err in denying the defendant's motion to suppress the evidence in question. See and compare, Draper v. United States, 358 U.S. 307, 310–314, 79 S.Ct. 329, 3 L.Ed.2d 327; Butler v. United States, 9 Cir., 273 F.2d 436, 440–443; Williams v. United States, 9 Cir., 273 F. 2d 781, 789–795. In our opinion, the arrest of the defendant was valid under Missouri standards (Mueller v. Powell, 8 Cir., 203 F.2d 797, 800–801) as well as federal standards (Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879; Draper v. United States, supra), and the seizure of the stolen soap was lawful.[3] The search and seizure did not constitute a general ex-ploratory operation such as was involved in Hobson v. United States, 8 Cir., 226 F.2d 890.

We are satisfied that none of the other trial incidents complained of by the defendant rose to the dignity of reversible error. What the defendant said to Albert Reece to the effect that because of having been in trouble before, he (the defendant) would probably have to "do time" and intended to plead not guilty, was, inferentially at least, in the nature of an admission against interest and not devoid of probative value. Even if it were to be regarded as inadmissible, its reception would not, we think, justify a reversal. The burden is on the appellant to show both error and prejudice, Goldstein v. United States, 8 Cir., 63 F.2d 609, 614, and "error which in a close case might call for a reversal may be disregarded as harmless where the evidence of guilt is strong." Garner v. United States, 8 Cir., 277 F.2d 242, 245, citing Glasser v. United States, 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680; Homan v. United States, 8 Cir., 279 F.2d 767, 773. This is not a close case.

We think it was not reversible error to permit Special Agent Stanfield to state what the defendant said when confronted by the soap, namely, that he wanted a lawyer and had nothing further to say. What he said might well have been stricken as immaterial, but we regard it as innocuous, particularly in view of Sergeant Kuda's testimony virtually to the same effect.

The admission of the testimony of Special Agent Stanfield that the defendant, after his arrest, asked Elzie Shelby to call his lawyers, naming them, was, we think, obviously harmless, and certainly did not violate any substantial right of the defendant.

The alleged misconduct of Government counsel in his closing argument to the jury is not properly subject to review, since the record on appeal does not

---

3. The cases of Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437 and Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 1453 decided by the Supreme Court on June 27, 1960, do not require a different conclusion.

contain all of the closing arguments in full. "This Court has repeatedly stated the obvious proposition that, in order to be able to decide whether arguments were both improper and prejudicial, it is necessary to have included in the record the arguments made by counsel on both sides. Chicago & N. W. R. Co. v. Kelly, 8 Cir., 74 F.2d 31, 37; London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 344." Illinois Terminal R. Co. v. Friedman, 8 Cir., 210 F.2d 229, 231. See, also, Haug v. Grimm, 8 Cir., 251 F. 2d 523, 526.

We have carefully considered the criticism leveled at a part of the trial court's instructions. The statement that to convict the defendant the jury must find beyond a reasonable doubt that the defendant "either knew or was aware of facts from which he could have reasonably inferred that it [the soap] was stolen," would seem to mean that, in the absence of actual knowledge or facts from which knowledge was reasonably inferable, the defendant was to be acquitted. In his charge, the trial judge quoted the pertinent parts of the applicable statute. After giving the instruction complained of, he further instructed the jury as follows:

"You will recall that the statute that was read to you states that a person must know that the goods he has in his possession are stolen in order to be guilty of the crime charged. This statute does not state that the person must know that the goods were stolen from an interstate shipment and it is not necessary for you to make this determination. It is sufficient if you find beyond a reasonable doubt that the defendant knew the soap was stolen, for one who knowingly possesses stolen goods and chattels does so at the peril that they may have been stolen from an interstate shipment.

"For you to conclude that the defendant possessed this knowledge it is not necessary that he must have been so told. Knowledge that goods have been stolen may be circumstantial or deductive through notice of facts and circumstances from which it may be fairly inferred."

Taking the charge as a whole, it was, in our opinion, fair, adequate and not misleading.

Our conclusion is that the defendant had a fair trial, that the trial court committed no reversible errors, and that the judgment and sentence appealed from is valid.

Judgment affirmed.