STATE of Missouri, Respondent,

v.

Arthur MITCHELL, Appellant.

No. 62130.

Supreme Court of Missouri,
En Banc.

Feb. 9, 1981.

Joe F. Willerth, Independence, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley Baker, Asst. Atty. Gen., Jefferson City, for respondent.

SEILER, Judge.

The question presented is, where there were no *Miranda* warnings given to defendant after his arrest and prior to his being interrogated by the police, can statements made be used by way of impeachment over defendant's objection that they are not voluntary, without first a hearing and affirmative determination by the trial court as to their voluntariness?

There was evidence from the state's witnesses from which a jury could reasonably have found that defendant broke into the victim's house and raped and robbed her. The jury convicted him of burglary, robbery, and rape, with sentences of fifteen years, life, and fifteen years respectively.

Defendant denied the commission of any crime. Although he was apprehended in the neighborhood of the crimes shortly after they occurred, he offered an alibi, contending he was in the area on legitimate purposes.

On cross-examination of defendant, the prosecutor started to ask defendant whether he had made any statements to Detective Fred Jordan early in the morning at police headquarters, following arrest. Defendant's counsel objected, saying that defendant was not given the *Miranda* warning, and also on the basis of "the grounds raised in my motion to suppress statement which has been filed with the court." One of the grounds contained in the motion to suppress was "[t]hat said statement was not voluntary and it was the result of mental and physical coercion and duress and threats." Counsel for the state argued that the matter was proper impeachment, that "[a]ny prior statement, whether or not he received *Miranda*, or not, it is proper to try to impeach him on a prior inconsistent statement." The court agreed and overruled the objection. Counsel for the state then elicited from defendant that he told Jordan a certain story as to his activities the night of the crime and that what he told the police was not the truth. What he told Jordan also differed materially from the alibi he testified to on direct examination, including the explanation of how he happened to be present in the vicinity of the crime when arrested by the police a short time after the crime occurred. In his closing argument to the jury, the prosecutor commented that defendant had admitted he had lied, that he had lied twice, once to the detective and also to the two police officers who arrested him.

On appeal, defendant contends the admission of the statement made to Officer Jordan, over defendant's objection, was in violation of his constitutional rights, that the court did not determine that the statement was freely and voluntarily given and its use as impeachment permitted the jury to infer that defendant had lied during direct examination.

The state contends that even though no *Miranda* warning was given, nevertheless the statement was voluntary and was sufficiently trustworthy to permit its use.

As earlier stated, defendant's counsel filed a motion to suppress statement of defendant, listing several grounds, one being that the statement was not voluntary and another that it was obtained in violation of defendant's constitutional rights under art. I, § 19 of the Missouri Constitution and the fifth, sixth and fourteenth amendments to the United States Constitution. There is nothing in the record to show that this motion was acted upon, but the following does appear: The morning of trial defendant filed a pro se motion to dismiss counsel and appoint someone else. There was a hearing on this motion during which defendant explained to the court that one reason for his dissatisfaction was that counsel had failed to file a motion for dismissal as requested by defendant on the ground that defendant "wasn't read my *Miranda* warning when I was first arrested."

The court inquired: "Does the State intend to introduce a confession in this case?", to which the prosecutor responded: "To my knowledge the defendant didn't make a confession." Then, in a colloquy between the court and the defendant covering several pages of transcript, the court, first asking, "Why would you need a *Miranda* warning if there was no confession?", explained to the defendant that the *Miranda* requirement applies if there is a confession and the state wants to introduce it, that there was nothing like that in the case, that the police do not have to give the warning unless they try to put a confession in evidence, that defendant would have to take his word on the point, that it would not have helped had his lawyer filed the motion defendant asked him to file, it would have been a waste of time, and so the court was overruling defendant's motion to dismiss counsel. The trial then proceeded. The court thus entered into trial on the assumption no confession had been obtained and without holding a hearing on the motion to suppress defendant's statement.

■ The law is clear that statements obtained by the police where the *Miranda* rules have not been observed may be used for impeachment purposes only if they are in fact voluntary. In *Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1970), the court held it did not follow such statements were barred for all purposes, "provided of course that the trustworthiness of the evidence satisfies legal standards." In *Oregon v. Hass*, 420 U.S. 714, 722, 723, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975), the court reiterated the above language from *Harris* and closed by referring to the "traditional standards for evaluating voluntariness and trustworthiness." In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), where defendant's statements in response to a detective's questions were used in an effort to impeach defendant, the court held such statements were admissible for impeachment, even in circumstances violating the strictures of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "if their 'trustworthiness satisfies legal standards' . . . But *any* criminal trial use against defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.' . . . If, therefore, Mincey's statements to Detective Hust were not 'the product of a rational intellect and a free will' . . . his conviction cannot stand . . ."

■ In Missouri the law is stated thus in *State v. Sager*, 600 S.W.2d 541, 557 (Mo. App.1980): "There are two criteria which must be followed when using statements by way of impeachment and rebuttal. The first is a showing that such statements are voluntary." In the case at bar, objection was made that the statements were not voluntary. Without making any determination as to whether the statements were voluntary, the court overruled the objection, on the ground that the absence of *Miranda* warnings does not prevent use of a statement for impeachment purposes. This is true, but only if the statement is voluntary and here it was objected that it was not.

■ As said, defendant contended his statement was not voluntary, first in a motion to suppress, which was never acted upon, and second in his objection at the time the statement was offered against him. The burden of proof as to voluntariness, once the confession or statement is challenged, is upon the state. *State v. Hunter*, 456 S.W.2d 314 (Mo.1979); *State v. Sager, supra.* Here the issue was not explored by the court and we cannot determine from the present state of the record what facts might have been presented had the court conducted a hearing. It is conceded that defendant was struck in the head by one of the policemen shortly after his arrest. The police officer, McCoy, said defendant tried to break away and "I subdued him." McCoy, using his fist, in which he was holding a "walkie-talkie" hand radio, knocked defendant to the ground. This produced a bleeding laceration on defendant's forehead. On cross-examination, McCoy was unable to recall if he struck defendant directly with the radio. He also stated that he "had to subdue him again", without detailing what he did. Defendant's version was that McCoy hit defendant without provocation, McCoy first calling him a liar; that he was knocked to the ground, was unconscious for a short time and when he regained consciousness, he found himself handcuffed and someone was kicking him.

Defendant said he had been smoking marijuana and "snorting" cocaine earlier in the evening and was somewhat "high", but that he remembered the events of the evening. McCoy said that he saw no indication that defendant was high on drugs. Defendant also said his leg was injured when he was forced into the police car.

From the scene of arrest, defendant was taken to the police station. He was questioned by Jordan during early hours of the morning, but the record is silent as to when, for how long, what the circumstances were of the questioning, or what defendant's condition was at the time.

A hospital report from Truman Medical Center was put in evidence. It was dated

June 20, 1979, 5:25 a. m., and stated that patient was hit by police with flashlight over right eye, sustaining laceration and was knocked out. It stated further that patient says he was unconscious for less than a minute and that his gait has been slightly unsteady. He also complained of pain in the left knee, but there was no swelling or pain to palpation along joint line or lateral or medial instability. Physical examination disclosed a very superficial laceration of the right forehead; closed with steristrips. Condition upon release was satisfactory. It does not appear whether the hospital examination took place before or after Jordan questioned defendant.

█ The fact that the court gave an instruction (MAI–CR2d), to the effect that if the jury found that a statement was made by defendant and was made freely and voluntarily, then the jury could give it such weight as they believed it deserved, but if not made freely and voluntarily, the jury must disregard it, does not cure the failure of the trial court to pass first on the voluntariness issue. It has long been the law in Missouri that as to confessions the trial court must first determine whether it is voluntary and, if so, the confession can then be put in evidence, with the jury also being given the opportunity to pass on its voluntariness. *State v. Washington*, 399 S.W.2d 109, 114 (Mo.1966). See, also *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1963). The same principle would apply where a statement made by the defendant is being used against him in a criminal trial for impeachment purposes, rather than as an out-right confession or admission.

Before this appeal can be finally determined, a supplemental hearing is required on the voluntariness issue, using the procedure employed in *State v. Gower*, 418 S.W.2d 10, 14 (Mo.1967). Accordingly, the cause will be remanded so that the trial court may bring defendant, with counsel, before it at an appropriate time for these purposes:

1. A full evidentiary hearing on the voluntariness issue and a determination and finding by the court whether the statement to Detective Jordan was voluntary or involuntary. If, after such hearing, the court finds and determines that it was involuntary, the judgment shall be set aside and the trial court shall grant a new trial on all issues, without the statement being admitted in evidence.

2. If the court finds and determines that the statement was voluntary, then it shall certify the transcript of the hearing and its determination and findings to this court to be made a part of the transcript in the cause for determination and disposition of the appeal upon the record as supplemented.

BARDGETT, C. J., and WELLIVER and HIGGINS, JJ., concur.

DONNELLY and RENDLEN, JJ., dissent in separate dissenting opinions filed.

MORGAN, J., dissents and concurs in separate dissenting opinion of RENDLEN, J.

DONNELLY, Judge, dissenting.

I respectfully dissent.

Relying on *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1970), the majority holds that the "law is clear that statements obtained by the police where the *Miranda* rules have not been observed may be used for impeachment purposes only if they are in fact voluntary" and remands for case for an evidentiary hearing on the issue of the voluntariness of appellant's statement.

Relying on Art. I, § 19, of the Missouri Constitution, which states, in part, that "no person shall be compelled to testify against himself in a criminal cause," I would hold that the statement involved in this case is inadmissible for *any purpose*, impeachment or otherwise.

I agree with Mr. Justice Brennan, who, in his dissent in *Harris, supra*, made the following observations:

"[T]he accused is denied an 'unfettered' choice when the decision whether to take the stand is burdened by the risk that an

illegally obtained prior statement may be introduced to impeach his direct testimony denying complicity in the crime charged against him. We settled this proposition in *Miranda* where we said:

> 'The privilege against self-incrimination protects the individual from being compelled to incriminate himself in *any* manner . . . . [S]tatements merely intended to be exculpatory by the defendant are often *used to impeach his testimony at trial . . . . These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.*' 384 U.S., at 476–477 [86 S.Ct. at 1629] (emphasis added).
>
> This language completely disposes of any distinction between statements used on direct as opposed to cross-examination. 'An incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt and no constitutional distinction can legitimately be drawn.' *People v. Kulis*, 18 N.Y.2d 318, 324, [274 N.Y.S.2d 873, 876] 221 N.E.2d 541, 543 (1966) (dissenting opinion)."

*Harris, supra*, at 230–31, 91 S.Ct. 648–49 (Brennan, J., dissenting).

The Supreme Court's withdrawal from *Miranda*, described by Mr. Justice Brennan in his *Harris* dissent, *supra*, has been the subject of widespread criticism by the commentators. *See, e. g.*, 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.6(a) (1978); The Supreme Court 1970 Term, 85 Harv.L.Rev. 44 (1971); Dershowitz & Ely, *Harris v. New York*: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority, 80 Yale L.J. 1198 (1971); Comment, *Harris v. New York*: The Death Knell of *Miranda* and *Walder*?, 38 Brooklyn L.Rev. 357 (1971); Comment, Impeachment of a Defendant-Witness By the Use of Illegally Obtained Statements: From Walder to Harris—The Exception Becomes the Rule, 22 Syracuse L.Rev. 685 (1971); Note, 40 Cin.L.Rev. 350 (1971); Note, 24 Fla.L.Rev. 194 (1971); Note, 40 Fordham L.Rev. 394 (1971); Note, 25 Miami L.Rev. 531 (1971); Note, 7 New Eng.L.Rev. 123 (1971); Note, 24 Vand.L.Rev. 843 (1971); Note, 8 Wake Forest L.Rev. 276 (1972); and Note, 1971 Wash.U.L.Q. 441.

The Supreme Court, in *North Carolina v. Butler*, 441 U.S. 369, 376 n.7, 99 S.Ct. 1755, 1759, 60 L.Ed.2d 286 (1979), stated that it "must accept whatever construction of a state constitution is placed upon it by the highest court of the State." With this in mind, I would join those states that "impose greater restrictions on police activity than the Supreme Court of the United States holds to be necessary upon federal constitutional standards." *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). *See also State v. Johnson*, 524 S.W.2d 97, 104 (Mo. banc 1975). Those states are: California, *People v. Disbrow*, 16 Cal.3d 101, 127 Cal.Rptr. 360, 545 P.2d 272 (banc 1976); Hawaii, *State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971); and Pennsylvania, *Commonwealth v. Triplett*, 462 Pa. 244, 341 A.2d 62 (1975).

"The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system. The 'essential mainstay' of that system, *Miranda v. Arizona*, 384 U.S., at 460, 86 S.Ct., at 1620, is the privilege against self-incrimination, which for that reason has occupied a central place in our jurisprudence since before the Nation's birth." *Harris, supra*, 401 U.S. at 231–32, 91 S.Ct. at 648–49 (Brennan, J., dissenting).

I would assure that "essential mainstay" through the Missouri Constitution and reverse and remand the case for a new trial.

RENDLEN, Judge, dissenting.

I respectfully dissent. Following defendant's having taken the stand to testify extensively on direct examination, the trial court properly, in my view, permitted the State to utilize defendant's single brief prior inconsistent statement for impeachment during his cross-examination. A review of

the facts demonstrates the propriety of the trial court's action which the principal opinion unjustifiably faults, and would remand the cause for the purpose of conducting a "formal hearing" and would require the court to make formal findings on the issue of voluntariness of defendant's prior inconsistent statement.

On the night of June 19, 1979, the victim, a sixty-two year old widow, retired in her home at East 73rd Street in Kansas City between 10:30 and 11:00 p. m. Awakened by someone breaking through her bedroom window, she screamed and set off an alarm which sounded in the house. The intruder, defendant here, threatened the victim with a "ballbat," took approximately $40 from her billfold, then tied her hands, tore her clothes and raped her. When she attempted to dissuade him, defendant threatened to break her leg with the bat. He then threw a sheet over her head, took her to another room, forced a diamond solitaire ring from her finger and emptied her billfold. Though the lights were out in her home during the attack, the victim could see defendant's outline and recognize he was a Negro with a short Afro haircut. The ring he forced from her finger was never recovered, but fingerprints identified as those of defendant were discovered in her bedroom. Toward the end of the 30 to 35 minutes defendant was committing these crimes, the telephone rang but defendant ordered his victim not to answer it. Shortly thereafter, apparently seeing or hearing the police officers outside the house, defendant ran to the front window, tore through the screen onto the front porch and fled.

The victim's next door neighbor, a Mr. Gentry, heard the scream and the sound of the alarm in the victim's home, and fortunately, called the police. In response Officers McCoy and Kelly came to the scene and learning these suspicious facts, directed Gentry to phone the victim's house. Gentry let the phone ring at least 10 times but no one answered. The officers, who were investigating the victim's house by shining their lights in the house and knocking at the doors (McCoy in front and Kelly at the rear), attempted to learn what was happen-

ing. McCoy heard the phone ringing and then "a loud terrifying scream come from inside the house." Kelly saw a figure running inside the house and he cried out to McCoy, who saw defendant break through the screen of the front window and run from the yard. McCoy and Gentry (who also saw defendant leap from the house) were able to discern he was a Negro dressed in a tank top, denim jeans and tennis shoes. McCoy, about twelve to fifteen feet from the window when this happened, chased defendant but, unable to keep up, lost him. Concerned for his partner's safety McCoy returned to the house not knowing what danger awaited. Entering the house the officers found the victim and learned of the rape and robbery. McCoy immediately contacted headquarters relaying a description of the suspect and the fact of the crimes. A headquarters radio bulletin containing this information was received by two female officers, Cummings and Howard, patrolling by car about 10 blocks away. Driving toward the vicinity of the crime, they saw a male Negro fitting the bulletin's description run onto a porch of a house within two blocks of the victim's home. Stopping in the driveway they turned their car's spotlight on defendant and leaving the car, approached him on foot. Defendant came off the porch and as he did so they saw he fit the broadcast description, noting that his tank top was wrong side out and backwards, his blue jeans were unzipped, he was perspiring profusely, out of breath, and his hair matted with debris.

## STATEMENT # I

As he approached, they told him to stop. Maintaining a safe distance, they asked if he lived there, to which he responded, *"no, he didn't, but his sister did."* Officers Cummings and Howard testified to the fact of this statement *without objection* by defendant. Indeed, evidence as to statements such as this made at the scene during the early investigative period prior the arrest are not objectionable for want of *Miranda* warnings. *State v. Darris*, 587 S.W.2d 89 (Mo.App.1979), *Beckwith v. United States*,

425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In this connection it should be noted that Officer Howard knocked at the house where defendant said his sister lived, and the owner, a Mr. Roosevelt Griffin, came to the door. Griffin explained that this was his home, and, observing defendant at the officer's request, stated he did not know him. Defendant realized then his lie had been exposed. Neither defendant, who testified of this incident on direct and cross-examination, nor any other witness suggested any fact indicating the statement was other than voluntary. Instead this statement demonstrated defendant's quickness of mind and cunning purpose to remove the suspicion of guilt. As defendant testified on direct, he had run onto the Griffin front porch to dispose of marijuana he was carrying and then told the lady officers it was his sister's house because "I thought they would leave and I would be able to get my marijuana and go home." During cross-examination defendant admitted the statement made that night on the front lawn at the Griffin house was false.

### STATEMENT # II

About 13 or 14 minutes after defendant broke from the victim's window, Officer McCoy received a call that a suspect had been located by Cummings and Howard at the "Griffin home." He went there immediately and was able to positively identify the defendant. According to McCoy's testimony the defendant then stated that he was merely "*attempting to go in a friend's house.*" This was the second statement made that night to divert suspicion and explain his presence on the Griffin front porch. He was then placed under arrest.

Testimony as to this second "statement," like that of the first discussed above, went in without objection and defendant under cross-examination admitted it too, was false. The circumstances surrounding this statement demonstrated that, like the first discussed above, it was voluntary without hint of force or coercion, and accordingly, it was not objected to at trial, in post trial motion or on appeal.

The foregoing detailed discussion of this clearly proper trial proceeding is necessary only because the principal opinion without explanation mixes its discussion of these two false statements with defendant's third false statement given later at the station to Detective Jordan.

The principal opinion carries this confusing mix into its discussion of the prosecutor's closing argument, giving the impression that defendant's false exculpatory statements # I and # II, *supra,* could be considered as a part of or impinging upon the claimed error concerning the false third statement, which will be considered presently in this dissent. This subtle synthesis occurs in the following passage of the principal opinion:

> Counsel for the state then elicited from Defendant that he told Jordan a *certain story as to his activities the night of the crime* [false statement # III] and that what he told the police was not the truth. What he told Jordan also differed materially from the alibi he testified to on direct examination, including *the explanation of how he happened to be present in the vicinity of the crime when arrested by the police a short time after the crime occurred.* [This is a blend of false statements # I and # II] In his closing argument to the jury, the prosecutor commented that defendant had admitted he had lied, that he had lied twice, once to the detective [false statement # III] and also to the two police officers [false statements # I and # II] who arrested him. (Emphasis added)

To understand the relatively insignificant role of defendant's false statement to Detective Jordan and its alleged prejudicial effect, it must be examined in the context of the trial and the portions of the record pertinent to the contention of error actually *raised and preserved* by defendant-appellant.

### STATEMENT # III

Following defendant's arrest near the Griffin house, during the early morning of June 20, 1979, he was taken to the station

and there, still during early morning hours, told Detective Jordan *he had been at his mother's home sleeping from about 9:00 p. m. until 12:30 a. m. on the night in question, when he awakened and left her house.* This was the third false statement. On direct examination he changed his story and testified that *on the night in question he had been at the home of one Rudy Nickens,* (instead of his mother's house) *and left at about 1:00 a. m.* On cross-examination he admitted the statement made to Jordan that he was at his "mother's house" was false.

It should first be emphasized that the statement to Jordan was used on cross-examination for impeachment going only to the issue of credibility, not as substantive proof of the crime.

It is well settled that a defendant's pre-trial statements, rendered inadmissible by *Miranda*[1] violations, may be used to impeach a defendant electing to testify. *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971). The Court in *Harris,* holding that such a statement, excluded as substantive evidence, was properly available for the limited purpose of impeaching a defendant, stated:

> "... Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [citations omitted] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. [footnote omitted] Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

> "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." *Harris v. New York, supra,* at 225–226, 91 S.Ct. at 646.

Just as petitioner in *Harris* failed to preserve his claim that the statement was involuntary or coerced, defendant here preserved only an objection bottomed on the absence of *Miranda* warnings. Notwithstanding the *Miranda* claim, the trustworthiness of defendant's statement satisfies legal standards and was admissible to impeach his credibility. To like effect is *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), in which the Court, reversing the Supreme Court of Oregon, held that testimony of an officer inadmissible on chief for fifth and fourteenth amendment grounds was nevertheless admissible on rebuttal for impeachment purposes.

The principal opinion cites *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), as authority requiring remand of this cause, but in so doing misapplies the holding in *Mincey.* There defendant contended that statements obtained from him at the hospital shortly after he had been shot and critically wounded were inadmissible because, though used only to impeach his credibility, they had not been made voluntarily. As to this the Court explained:

> "Mincey was brought to the hospital after the shooting and taken immediately

---

1. *Miranda v. Arizona,* 348 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

" ... Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper provided by the hospital. . . . *Mincey v. Arizona, supra,* at 396, 98 S.Ct. at 2415.

\* \* \* \* \* \*

"It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital 'depressed almost to the point of coma,' according to his attending physician. Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit. [footnote omitted] He complained to Hust that the pain in his leg was 'unbearable.' He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. [footnote omitted] Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, 'at the complete mercy' of Detective Hust, unable to escape or resist the thrust of Hust's interrogation. [citation omitted]

"In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. As soon as Hust's questions turned to the details of the afternoon's events, Mincey wrote: 'This is all I can say without a lawyer.' Hust nonetheless continued to question him, and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. Hust ignored that request and another made immediately thereafter. [footnote omitted] Indeed, throughout the interrogation Mincey vainly asked Hust to desist. Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. [footnote omitted] But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." *Mincey v. Arizona, supra,* at 398–401, 98 S.Ct. at 2416–2418.

The significance of *Mincey,* is not its reiteration of generally recognized due process principles, but instead lies in the fact that the Court because of the officer's gross misconduct *examined the record de novo* and found, contrary to the trial and state supreme court, *that the evidence demonstrated involuntariness as a matter of law.* The facts there involved among other things an exhaustive four day warrantless search of defendant's apartment, which included opening of drawers, ripping up carpets and seizure of 200 to 300 objects. This police misconduct offended the Court. After criticizing this extensive search the Court turned to due process question and made its *independent evaluation as to the involuntariness* of Mincey's statements. Many critical fact differences distinguish *Mincey* from the case at bar. Here defendant had made two cunning attempts to exculpate himself before he made this statement in question to Detective Jordan. That statement also was clearly a thinly dis-

guised falsehood to provide defendant a possible alibi quite unlike the "written answers of Mincey" some of which "were on their face not entirely coherent." *Mincey, supra,* at 399, 98 S.Ct. at 2417.

Further, contrary to defendant's assertion he was struck and rendered unconscious by Officer McCoy and kicked while at the Griffin house, the two arresting officers testified they did not strike defendant nor did they see anyone abuse him. Officer McCoy, who arrived and identified defendant as the one who, a brief time earlier had escaped from him at the scene of the crime, testified that when the "wagon" arrived defendant again "attempted to break away" and he struck him once with his fist to subdue him and prevent another escape. McCoy stated he had a radio in his hand which explained the medical report's account of a "small triangular" and "very superficial" laceration on defendant's forehead that was treated with a "steristrip" (band-aid) and required no medication. The report instructed defendant to "[l]eave strips on until they fall off naturally." These facts bear scant resemblance to those of *Mincey.*

Detective Jordan who saw defendant after he arrived at the station and to whom defendant made the statement that he had been at his mother's house (rather than the home of Rudy Nickens) gave no indication of any mistreatment, nor did defendant when cross-examined about this conversation with Jordan suggest that Jordan or anyone else used force or coercion resulting in the brief exculpatory-alibi statement now complained of.

Defendant now contends in his brief (but not in his pre-trial motion, his trial objection or his post-trial motion) that the statement was inadmissible for impeachment because he was under the influence of drugs. However, testimony from the State's witnesses was that defendant "definitely" did not appear to be high on drugs. Though he admitted having "smoked some marijuana and snorted some cocaine," defendant himself *testified it affected him only as a stimulant and it did not affect his memory of the events.* Having considered these matters, the trial court admitted, for impeachment, testimony of defendant's false statement to Jordan. The jury was instructed that the statement was to be considered only in weighing the credibility of defendant.

Next, defendant erroneously claims no ruling on the issue of voluntariness was made by the trial court. This ignores the fact that inherent in the trial court's ruling on defendant's trial objection to admission of the impeachment testimony was a determination that a sufficient showing of voluntariness had been made. Here and in *Mincey, supra,* at 397, note 12, 98 S.Ct. at 2416, note 12, "[t]he trial court made no findings of fact, nor did it make a specific finding of voluntariness." However, here as in *Mincey,* defendant had originally moved to suppress the challenged statement on the ground it had been elicited (1) in violation of his *Miranda* rights and (2) it had been involuntary. In this case, as in *Mincey,* it was understood the statement would be used only to impeach the defendant if he took the stand. As stated in *Mincey,* at 397, note 12, 98 S.Ct. at 2416, note 12, "[a]ny violation of *Miranda* thus became irrelevant." The Court, here as in *Mincey,* ruled the statement was admissible for impeachment. "The court thus necessarily held that Mincey's [defendant Mitchell's] responses to Hust's [Jordan's] interrogation were voluntary." *Mincey,* at 397, note 12, 98 S.Ct. at 2416, note 12.

The principal opinion somehow overlooks the above referenced portion of the Court's opinion in *Mincey.* However, because there was no formal hearing on the issue of voluntariness, the principal opinion mistakenly directs that the cause should be remanded for such formal hearing and an *express finding.* Such course is neither desirable nor required. The record discloses the challenge to voluntariness was made in defendant's pre-trial motion to suppress and again interposed by trial objection when the impeaching statement was offered in evidence. The proof of voluntariness had by then been fully developed, and defendant

made no request for a hearing *in camera.* The Court was not required to *sua sponte* undertake a separate formal hearing outside the presence of the jury or further hearing in open court.

A similar issue was decided in *State v. Royal,* 610 S.W.2d 946 (Mo.1981) wherein it was stated:

"Where there is conflicting evidence on the voluntariness of a statement, as there is here, the admissibility of a confession by a trial court is a matter of discretion which is not lightly disturbed. *State v. Flowers,* 592 S.W.2d 167, 170 (Mo. banc 1979); *State v. Hopkirk,* 84 Mo. 278 (1884). Inasmuch as the trial court implicitly found these statements voluntary, and such finding being substantially supported by the record, appellant's first contention is rejected."

The remand for such hearing ordered by the principal opinion is contrary to the recent case on which the majority would rely, *State v. Sager,* 600 S.W.2d 541 (Mo. App.1980). In *Sager,* this pertinent passage appears:

"In the instant case, objection was interposed, but the record does not reflect such objection challenged the voluntariness of the statements and there was no request for an independent formal hearing upon the issue of voluntariness. The court is not required to conduct such a hearing on its own motion, see *State v. Jackson,* 448 S.W.2d 895 (Mo.1970), reaffirmed in *State v. Harper,* 465 S.W.2d 547 (Mo.1971). . . .

"While on this appeal it is argued that since the statements were suppressed in the state's case in chief and they stood as such throughout the trial, there is no showing upon trial at the time of cross-examination and rebuttal that such statements were involuntary; and absent any

attempt by appellant to request such a showing, this court is left to merely speculate what such a request, if any, [would reveal]."

*Id.* at 557.

See also *State v. Jackson,* 448 S.W.2d 895 (Mo.1970); *State v. Harper,* 465 S.W.2d 547 (Mo.1971).

Next, and most significantly, the issue of voluntariness *was not preserved for appellate review.* This vital feature of the appeal is missed entirely by the principal opinion. The law requires that trial objection and subsequent motion for new trial must direct the trial court's attention to the alleged error by clearly stating with particularity the grounds for such complaint. *State v. Scott,* 487 S.W.2d 528, 530 (Mo. 1972); *State v. Price,* 422 S.W.2d 286, 289 (Mo.1967). Asserting in general the "grounds raised in [the] motion to suppress" lacks requisite particularity to preserve those grounds for appellate review. *State v. Underwood,* 569 S.W.2d 390, 391 (Mo. App.1978). Additionally, appellant may not on appeal change assertions of error as presented to the trial court in his motion for new trial. *State v. Scott, supra; State v. Lenza,* 582 S.W.2d 703, 710 (Mo.App. 1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980). In sum, failure to assert the specific ground urged on appeal at each opportunity at the trial level results in a lack of preservation, leaving an appellate court nothing to review. Rule 27.20 (1979), now Rule 29.11 (1980); *State v. Price, supra; State v. Thomas,* 526 S.W.2d 393, 395 (Mo.App.1975). Here the motion for new trial raises only the objection that the defendant Mitchell's statement to Detective Jordan was inadmissible because (1) no *Miranda* warnings had been given and (2) the State had agreed not to use the "statement of [d]efendant in trial." [2]

---

2. The applicable portion of defendant's motion for new trial is as follows:

"4) That the trial Court erred in overruling Defendant's specific objection made at trial to the testimony of witness, Fred Jordon (sic), detective, as to a statement made by Defendant, Arthur Mitchell, because:

a) Defendant, Arthur Mitchell, was not, prior to the giving of the statement, properly advised of his constitutional rights as set forth in *Miranda-vs-Arizona,* 334 (sic) U.S. 436 (sic) to include the Defendant's right to remain silent, that anything he said could and would be used against him at a trial, that he had a right to an attorney being present dur-

As to these grounds, (1) the *Miranda* warning issue is not pertinent for reasons previously discussed. (2) As to a so-called "agreement," the only mention of such matters occurred during the pre-trial conference among the parties in chambers concerning defendant's contention that no *Miranda* warnings had been given. The Court inquired of the prosecutor, "Does the State intend to introduce a confession in this case?" "Mr. Gnefkow: [the prosecutor] To my knowledge the defendant didn't make a confession." This belies defendant's assertion; there was in fact no such agreement. Hence, it must be concluded the issue of voluntariness was not preserved for review, and yet the principal opinion would fault the trial court for denying the motion for new trial, on the issue of voluntariness, when that motion did not raise or present such issue for the trial court's consideration. In so doing the principal opinion *sub silentio* overrules *State v. Price*, 422 S.W.2d 286, 289 (Mo.1967), where it is stated:

> "His motion for new trial must present and direct the trial court's attention to his trial objections by clearly stating with particularity his constitutional grounds. In other words, his constitutional grounds for objection must be kept alive and preserved throughout the case."

It is inappropriate for this Court to disparage the trial court's action and order reversal or remand on an issue not preserved on appeal and worse to do so *sua sponte* on a record such as this.

Finally if error occurred, it was nonprejudicial, requiring neither reversal nor remand. The evidence of guilt is overwhelming. Seldom will we see a more dramatic demonstration of concerned involvement by a private citizen than the actions of Mr. Gentry in promptly investigating the suspicious sounds emanating from the victim's home and then summoning the police. This coupled with the courageous actions of Officers McCoy and Kelly saved the victim from possible further harm and caused the felon to flee from her home. Their actions resulted in his immediate identification; and within 15 minutes, through the alert actions of Officers Cummings and Howard, he was apprehended and positively identified. His fingerprints were found in the victim's bedroom. He admitted lying twice to avoid arrest, and the 25 year old defendant admitted on direct examination to prior crimes of auto theft (1971—2 year sentence) and assault with intent to kill with malice (1976 —5 year sentence). He had only been released from prison on the later crime, since February 7, 1979. His alibi strained credulity and was not believed.

We should be mindful of our law that "error which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong. *Thomas v. United States*, 8 Cir., 281 F.2d, 132, 136." *State v. Degraffenreid*, 477 S.W.2d 57, 65 (Mo. banc 1972).

The trial court did not err in the issue considered here, the remand directed by the principal opinion for a further hearing at the trial level is contrary to settled principles in the law. This nonpreserved issue has been improperly ruled in a manner unjustly faulting the trial court.

The cause should be retained in this Court and the other issues properly preserved for appellate review, but not considered by the principal opinion, should be promptly decided.

---

ing questioning, that if he could not afford an attorney, that one would be appointed for him, and that he had a right to stop the interrogation at anytime he so desired.

b) That the statement made was the subject of a Motion to Suppress Statement filed by Defendant prior to trial and in which the State of Missouri agreed not to use the statement of Defendant in trial of the above-captioned matter, hence, its use in cross examination of the Defendant was improper and reversible error."