STATE of Missouri, Respondent,

v.

Anthony LYTLE, Appellant.

No. 68042.

Supreme Court of Missouri,
En Banc.

Sept. 16, 1986.

L. Patrick O'Brien, Kansas City, for appellant.

William L. Webster, Atty. Gen., Christine M. Szaj, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Defendant appeals his convictions for the first degree murder (felony murder), § 565.003,[1] of Pauline Chambers, armed criminal action, § 571.015, and robbery in the first degree, § 569.020, committed during a burglary. Error is asserted in the admitting of defendant's confession which he contends was coerced, involuntary, and taken in violation of U.S. Const. amends. V and XIV.

Defendant was charged by a six-count indictment: Count I, first degree murder of Earl Chambers, § 565.003; Count II, armed criminal action, § 571.015; Count III, first degree murder of Pauline Chambers, § 565.003; Count IV, armed criminal ac-

tion, § 571.015; Count V, robbery in the first degree, § 569.020; and Count VI, burglary in the first degree, § 569.160. The jury acquitted defendant on Count II and though they found him guilty of manslaughter and burglary in the second degree on Counts I and VI, respectively, the trial judge "dismissed" those counts. Defendant was sentenced to consecutive life sentences on Counts III and IV and to a concurrent twenty-five-year sentence on Count V.

The Court of Appeals, Western District, reversed because of the alleged improper admission of defendant's videotaped confession and remanded for new trial. The cause comes to us on certification of a dissenting judge. Mo. Const. art. V, § 10.

## I.

On the morning of November 27, 1983, police officers found Pauline and Earl Chambers lying dead from stab wounds on the bedroom floor of their Kansas City home. The front door of the home had been kicked in, the house ransacked and a bloody eleven-inch butcher knife was found in one of the bedrooms. One of the shoe prints found on the blood-stained floor matched tennis shoes recovered from Donald "Bug" Dixon. Blood stains were found on shoes recovered from Jon Keith Smith and one of the Chambers' television sets was found at the Smith residence bearing Jon Keith's palm print. A second television, with Earl Chambers' social security number, was found under the front porch at James Bowman's residence.

Shortly after the murders, police officers interrogated defendant, on November 30 and again on December 2. Evidence presented by the state at a pretrial suppression hearing and at trial demonstrates the following:

On November 30, 1983, defendant was taken into custody for questioning and af-

---

1. All statutory references are to RSMo 1978 unless otherwise indicated. Section 565.003 was repealed effective October 1, 1984, and felo- ny murder now falls within § 565.021, RSMo Cum.Supp.1984.

ter waiving his *Miranda* [2] rights was interrogated at police headquarters from 1:26 p.m. until 4 p.m. by Detectives Floyd Williams and Bennie White. Sometime after 1:26 p.m. defendant was allowed to talk to his mother. Detective Williams was "very hard" on defendant during this round of interrogation and used this "technique" to "shock the young man into reality, into telling the truth." He told defendant that "if he went to the penitentiary, he would definitely not survive because he was too small, he couldn't protect himself" and "if he would prefer to remain in Jeff City, that he wouldn't survive because of his size, age, and looks," but Williams did not "threaten" defendant that if he did not tell the truth he would go to jail. Despite this "hard-line" technique Detective Williams had trouble getting defendant to talk to him and believed he was holding back information. At some point during this round of interrogation, defendant was examined by polygraph and at the conclusion of that examination he again waived his *Miranda* rights. Defendant was then interrogated by Detectives Edward Glynn and Earl Craven from 5:30 p.m. until 10:45 p.m.[3]

Initially, on November 30, defendant denied all knowledge of the Chambers homicides but later admitted[4] being at the residence the night of the crime. He stated that he and Jon Keith Smith were at the home of a friend, Marcell Small, when Donald "Bug" Dixon and Eddie Bowman came by to get Small to go "stealing" with them. Although Small declined, defendant and Smith decided to accompany Dixon and Bowman. They proceeded to the Chambers' residence which Smith remembered was the home of some elderly white persons and upon arrival then discovered two other men already in the process of burglarizing the home. Defendant first stated he did not go into the house but learned from someone else there were two dead

persons inside. Defendant then changed his account by stating he did enter the residence, rummaged through some drawers and stood watch at the front door. He went to a hallway from which he saw the blood-covered body of a dead person lying on a bedroom floor and then, taking a number of items from the home with them, the two groups of men left separately. At the conclusion of the November 30 interrogation defendant was released to return home to his family.

On December 2, 1983, while at his workplace defendant was arrested, handcuffed, placed in a "paddy" wagon, and once more informed of his *Miranda* rights. He was taken to police headquarters and processed in approximately forty-five minutes and after again waiving his *Miranda* rights was interrogated from 7:06 p.m. until 10:15 p.m. by Detectives Glynn and Craven.

These detectives used a "quiet" or "soft-spoken" interrogation technique, talking to defendant in a normal tone of voice and in a father-son fashion. Glynn told defendant that he knew defendant was holding back information and that if he did not tell them everything then he would keep it inside him the rest of his life and it would eat him up. For approximately the first hour defendant repeated his statement that the Chambers already were dead when he arrived. Detective Glynn told defendant that if he knew something then he should tell the detectives, and that "[h]e could only help himself by doing this." But at some point he became tense, began to cry, his lips quivered and he was "on the brink of losing control." Detective Glynn then began to talk to defendant about other matters not related to the investigation such as his personal life, his church life, and whether he was a Christian. On Glynn's suggestion defendant walked around and took some breaths

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. There is some confusion as to which detectives participated in this round of questioning, but from the evidence it seems most probable that Glynn and Craven conducted this interrogation.

4. Again there is some confusion whether this admission occurred during the first or second round of questioning.

and for ten or fifteen minutes said nothing. At this point he became more relaxed and began to talk more openly with the detectives. He then told Glynn and Craven that "Eddie did it," a reference to Eddie Bowman. He stated that while in the house he heard grunts and groans from one of the bedrooms and then saw Bowman stab someone whom he later learned was Pauline Chambers. After the officers reviewed the sequence of events surrounding the Chambers murders, they videotaped defendant's confession. The videotaping did not begin until about one hour after the questioning had ceased.

In the videotaped confession, defendant described the events of the night of November 26, 1983, and early morning of November 27, 1983. Among those details were the following: Smith, Dixon, Bowman, and defendant drove around in Bowman's car looking for houses to burglarize. After knocking on several doors to determine whether anyone might be present, the four men proceeded to the Chambers' house and upon arrival they discovered that two other men were at that time burglarizing the house. Defendant, Smith, Dixon and Bowman joined the burglary in progress. Defendant kept watch for a while then rummaged through drawers while others carried items out of the house. Defendant could hear one of the other men talking in a bedroom, and defendant assumed he was talking to the residents. Bowman went into the bedroom and defendant heard a scuffle, then heard someone cry out "No, no, no" and "sounds of pain." Defendant ran to the bedroom where he saw Bowman stab someone he thought was a man "one last time" and then Bowman put a long-bladed knife in his pocket. The burglars completed their escapade, stealing wallets, coin purses, televisions, a microwave, a fur coat, and a jewelry box. After defendant helped load a television into the car, the two groups of burglars departed separately. Defendant initially drove the car though Bowman, who threw a number of items out of the car including wallets, a coin purse and a screwdriver, later took over. Eventually the four men arrived at Dixon's house where they took a television to see if it worked. They then drove to Smith's house and left a microwave and a television set and thereafter the others drove defendant home.

## II.

Prior to trial, defendant filed a motion to suppress the videotaped statement as involuntary, coerced, and the product of physical and psychological pressure so great as to overcome his will. A suppression hearing was held, at the conclusion of which the trial judge determined that "the statements of the defendant were voluntarily and freely given, and the motion to suppress the statements is overruled." The suppression hearing evidence, which for the most part also was introduced at trial, included the following in addition to the facts recited above.

Detectives Glynn and Craven testified they did not strike defendant, made no threats or promises, and exerted no psychological pressure. Craven testified that defendant's reactions during the interrogation—"the tearing, the quivering, and the nervousness"—were those expected from a witness to a vicious crime. Detective Williams, also a state's witness, testifying at the suppression hearing stated that on December 2 he questioned defendant for approximately 1½ minutes in order to clear up a certain detail. From Detective Williams' trial testimony, it is clear that he was alone with defendant during this brief interview on December 2 and it occurred after defendant had told Detectives Glynn and Craven that "Eddie did it." Williams testified concerning his observations of defendant at that time, stating at the suppression hearing that defendant was "too relaxed" and that "[a]t the time when I was talking to him, Mr. Lytle, my opinion was that he would have said anything to get rid of me." He further testified on cross-examination:

Q. And do you recall making the statement, "If I had asked him—referring to Tony Lytle—if they had been shot

with a cannon, he would have said, 'Yes' "?

A. Yes.[5]

Detective Williams had no contact with defendant after his original hardline questioning in the early afternoon of November 30, except possible minimal contact during that evening and except the brief moments on the evening of December 2. It was during these brief moments on December 2 that Williams formed his opinion that defendant was "too relaxed." It is important to note that defendant at that point had confessed to the "soft-line" detectives and was understandably relaxed. Moreover, given Williams' admitted use of the hard-line technique on November 30, it is most reasonable to assume that defendant felt uncomfortable or pressured by his presence and wanted him out of the interrogation room if possible. But most important, during those brief moments defendant told Williams nothing of significance and to the extent Williams' presence was threatening it cannot be said this produced an involuntary confession or that his opinion of defendant's condition altered the facts.

Defendant testified that when processed through the jail on December 2, he was held in a cell for twenty or thirty minutes (it was his first time in a cell), thereafter was fingerprinted and then completed an information sheet. He testified that he changed his statement because Detective Glynn struck him on the face with his fist. At the suppression hearing and at trial a mug shot of defendant taken after the videotaping was introduced into evidence, which purportedly showed bruises on his face. Defendant's mother testified at the suppression hearing and at trial that on December 3, 1983, defendant had swollen, discolored bruises on his face, as shown in the photograph, bruises which he did not have on December 2, 1983, before he went to work. At the suppression hearing she testified that she asked defendant what happened to his face and he said the detective hit him. At trial defendant's work supervisor testified that defendant looked no different in the photograph than he did when he left work on December 2, 1983, with the police officers. Defendant further testified that prior to changing his statement Detective Glynn told him "he was going to let me go to jail and get butt fucked." He testified, as he did at trial, that the truth was that he did not see anyone kill the Chambers, and that they were already dead. He placed the blame on Bowman because the detectives had shown him a piece of paper with this name on it and told him Bowman was "a sick person." Defendant felt that the detectives would believe him if he said Bowman did it and if he added more details to his statement.

Defense witness Dr. Jan B. Roosa, a clinical psychologist, testified that defendant is very suggestible, thinks in terms of what others want, and has difficulty sticking with his own thinking. He testified that where defendant tells the truth, yet is told that it is a lie, any response made by him could best be considered unreliable.

At trial, evidence was again adduced regarding the voluntariness of the videotaped statement, defendant's renewed objection was overruled and the tape played for the jury. The jury was instructed to disregard any statements made by defendant, not freely and voluntarily made.

### III.

In support of his contention that the videotaped statement was coerced, involuntary, and taken from him in violation of U.S. Const. amends. V and XIV, defendant argues that under the totality of circumstances—especially his age, his extremely impressionable nature, and the relentless questioning—his additional statement "Eddie did it" and its subsequent embellishment were involuntary, that true to his nature as described by Dr. Roosa, he in the end gave the interrogators what they want-

---

**5.** At trial, Detective Williams, in addition to repeating his suppression hearing testimony, also testified that defendant appeared "mentally drained and physically strained," and that in Williams' opinion defendant "didn't want to be questioned by them at that time."

ed to hear, rather than the truth, in order to satisfy them and to end the interrogation. He places heavy reliance upon the testimony of Detective Williams and asserts the record cannot support a finding that the state sustained its burden of proving voluntariness absent the trial court's express finding that it disbelieved Detective Williams' testimony.

A defendant is denied due process if his conviction is founded, in whole or in part, upon an involuntary confession. *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964). It matters not whether defendant in fact spoke the truth in the challenged confession. *Rogers v. Richmond*, 365 U.S. 534, 540–41, 543–44, 81 S.Ct. 735, 740–41, 5 L.Ed.2d 760 (1961). Once defendant objects to a confession's admission, there must be, prior to its admission into evidence, a clearcut determination that the confession was in fact voluntary. *Jackson v. Denno*, 378 U.S. at 377–91, 84 S.Ct. at 1781–89; *State v. Mitchell*, 611 S.W.2d 211, 214 (Mo. banc 1981). "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims v. Georgia*, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). While the burden of proving a confession's voluntariness is upon the state, it need be proved only by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *State v. Olds*, 569 S.W.2d 745, 751 (Mo. banc 1978).

The test for "voluntariness" is whether under the totality of the circumstances defendant was deprived of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. *State v. Higgins*, 592 S.W.2d 151, 158 (Mo. banc 1979), *appeal dismissed*, 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). When considering the totality of circumstances, no single fact is dispositive, *State v. Flenoid*, 642 S.W.2d 631, 634 (Mo. banc 1982), and in determining whether a confession was obtained by mental coercion, factors to consider include age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. *Id.; State v. Flowers*, 592 S.W.2d 167, 169 (Mo. banc 1979).

On appeal, we are faced with the question of whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given. *State v. Hughes*, 596 S.W.2d 723, 727 (Mo. banc 1980). Conflicts in the evidence were for the trial court to resolve and we defer to the trial court's superior position from which to determine credibility. *State v. Buckles*, 636 S.W.2d 914, 924 (Mo. banc 1982); *Higgins*, 592 S.W.2d at 158; *State v. Sherrill*, 657 S.W.2d 731, 739 (Mo.App. 1983).

Here defendant was repeatedly advised of his *Miranda* rights and on each occasion voluntarily waived those rights. While such is not dispositive of the voluntariness issue, it is an important consideration. *State v. Craig*, 642 S.W.2d 98, 100 (Mo. banc 1982); *Higgins*, 592 S.W.2d at 158. Furthermore, Detectives Glynn and Craven testified that they did not strike defendant, made no promises or threats, and applied no psychological pressure. They utilized a "quiet technique" of interrogation. When defendant grew tense and began to cry, the detectives attempted to calm him down; when defendant requested cigarettes, they were provided for him. Detective Craven testified that defendant's reactions during the interrogation were normal for a witness to a vicious crime.

We have reviewed the record on appeal and have viewed the challenged videotaped statement. Considering the entire record, we hold that there is sufficient evidence to sustain the trial court's finding that the statement was voluntarily made and it cannot be said it was unreasonable for the trial court to conclude from the totality of circumstances that defendant's confession was voluntary. The fact that there is evidence from which the trial court

could have arrived at a contrary conclusion is immaterial. *Lyons v. Oklahoma*, 322 U.S. 596, 603, 64 S.Ct. 1208, 1212–13, 88 L.Ed. 1481 (1944).

In affirming the trial court's finding of voluntariness, we are not unmindful of certain undisputed evidence, *e.g.*, defendant was eighteen years old, the detectives in essence employed the "Mutt and Jeff" routine, *see, e.g., Miranda v. Arizona*, 384 U.S. 436, 452, 86 S.Ct. 1602, 1616, 16 L.Ed.2d 694 (1966), and defendant was subjected to an extensive interrogation on November 30, during which Detective Williams told defendant that "if he went to the penitentiary, he would definitely not survive." But it is noteworthy that defendant was a high school graduate and in fact attended computer programming classes after graduating. Moreover, we observe that after being interrogated on November 30 he was released and went home for almost two days. During that two-day respite he was free to consult with family friends and anyone he chose. It was only after that two-day interval that he was again picked up and reinterrogated.[6] Defendant waived his rights to counsel and to remain silent, and he never thereafter asked that the questioning cease, which he could have done. Under all the circumstances, the trial court certainly was free to disbelieve defendant's testimony that his confession resulted from any violence or fear of violence.

In this, as in all cases where it is asserted that a confession was unconstitutionally obtained, "we are forced to resolve a conflict between two fundamental interests of society; its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement." *Spano v. New York*, 360 U.S. 315, 315, 79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1959).

We of course are limited to the appellate role, and from that perspective conclude the record here supports a finding that the state sustained its burden of proving voluntariness. Deferring to the trial court's determination of credibility and resolution of conflicts in evidence, the record does not command reversal.

We reject the proposition that, absent the trial judge's explicit finding that he disbelieved or in some way discredited Detective Williams' testimony, the record cannot support the trial court's finding that the state sustained its burden of proving voluntariness.

First, the testimony of Detective Williams, even if credited, is not fatal to the finding of voluntariness. Defendant made his challenged statement to Detectives Glynn and Craven, and Williams' testimony does not necessarily establish that defendant would have told *them* anything to stop the questioning; rather the trial court might have construed Williams' testimony narrowly and believed only that defendant would have told Williams, the "Mutt," anything to stop *his* questioning.

■ Second, the trial court might have disbelieved or discredited the opinion testimony, based upon a two-minute observation, and it need not so *expressly* find. "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims v. Georgia*, 385 U.S. at 544, 87 S.Ct. at 643. Here, the trial judge's conclusion that that confession is voluntary does appear from the record with unmistakable clarity, as he expressly stated that "the statements of the defendant were voluntarily and freely given." As for the trial court's findings on essential factual issues, upon which the ultimate conclusion of voluntariness is based, they must also be ascertainable from the record, but it is enough that they be clearly implied.

**6.** Defendant testified at trial that on December 1, 1983, he was taken to police headquarters where the officers left him in a cold interrogation room but did not interrogate him. Even if true such fact would not alter our holding and the trial court was free to disbelieve the testimony.

*Olds,* 569 S.W.2d at 750; *State v. Monteer,* 467 S.W.2d 48, 53–54 (Mo. banc 1971); *State v. Garrett,* 595 S.W.2d 422, 429–30 (Mo.App.1980). Here it is clearly implied by the trial judge's ruling that Williams' testimony was disbelieved or narrowly construed, and either of these implications supports the court's ruling of voluntariness.

We do not read *Olds,* 569 S.W.2d 745, as requiring reversal here. In *Olds,* the state offered no evidence to refute defendant's affirmative testimony that the interrogators ignored his requests to remain silent and his request for an attorney. *Id.* at 748–52. Despite this unrefuted testimony the trial court ruled that "Motion to Suppress will be overruled," making no findings of fact. *Id.* at 750. We reversed and remanded holding that "in the absence of the trial court's finding that it disbelieved defendant's testimony regarding requests for an attorney and to remain silent, we cannot find that the record supports the finding that the waiver and subsequent statements were voluntary." *Id.* at 751. The present case is clearly distinguishable from *Olds,* because here there is abundant testimony demonstrating voluntariness which refutes in detail defendant's contrary assertions and stands in conflict with defendant's evidence. Simply put, in *Olds* there was no evidence to refute defendant's testimony and no finding to fill this gap, but here such is not the case.

### IV.

We hold that the trial court did not err in admitting the challenged confession, the issue certified to us by the dissenting judge. The cause is retransferred to the Court of Appeals for consideration of defendant's remaining contentions of error.

HIGGINS, C.J., BILLINGS, DONNELLY and WELLIVER, JJ., and KELLY, Special Judge, concur.

BLACKMAR, J., concurs in separate opinion filed.

ROBERTSON, J., not sitting.

BLACKMAR, Judge, concurring.

With some hesitation, I concur.

Officer Williams is to be commended only for his frankness.[1] If he did not threaten the defendant, he certainly tried to scare him by such statements as "if he went to the penitentiary, he would definitely not survive because he was too small, he couldn't protect himself" and "if he would prefer to remain in Jeff City, that he wouldn't survive because of his size, age, and looks." Even in the absence of an express threat or express promise, the defendant well might get the idea that, somehow, he might avoid the penitentiary if he would implicate his companion.

Had the defendant's incriminating statements followed Williams' interrogation, it might have been necessary to exclude them as products of coercion. After studying the transcript, however, I am of the opinion that the possibility of taint presents a pure question of fact, and that the trial judge's findings are permissible under the circumstances. The defendant had at his command two magic phrases as follows: "I want a lawyer" or "I don't want to answer any more questions." With either of these he could have stopped all interrogation. The police are entitled to advise him of his rights and to leave it to him to claim these rights. They have no duty to counsel him as to the course of action which is wisest from his own standpoint. Nor is it of any significance that the defendant may be easily influenced or is of passive disposition, if he is properly informed of his rights and is capable of understanding them.

Officer Glynn also stepped close to the line when (by Craven's testimony) he told the defendant that, if he knew something, he should tell the officers, and that he could only help himself by doing this, and when he told him: "If you're involved in

---

1. I am repelled by the State's suggestion that the trial judge did not have to believe the officer's testimony. Where constitutional duties are in-

volved, the State should normally be bound by the testimony of its own officials responsible in the premises.

this thing, you need to get it off your chest; you need to tell us about it." The trial judge well might have found a promise of leniency in these words, but such a finding is not inevitable in the language used, and again we should defer to the finding of the trier of the fact.

The rules for interrogation are simple and should be followed. The officers of the law should not skirt the edges. But I am persuaded that the evidence supports the trial judge's denial of the motion to suppress, and so concur in the order of retransfer.