STATE of Missouri, Plaintiff–Respondent,

v.

Jeffrey J. RICHARDS, Defendant–Appellant.

No. 56155.

Missouri Court of Appeals, Eastern District, Division Four.

July 3, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 15, 1990.

Application to Transfer Denied Oct. 16, 1990.

William L. Webster, Atty. Gen., Christine A. Alsop, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Maribeth McMahon, Public Defender, Clayton, for defendant-appellant.

JOSEPH J. SIMEONE, Senior Judge.

I

Appellant, Jeffrey J. Richards, was charged by information in lieu of indictment with second degree murder, § 565.021.1 RSMo 1986,[1] and convicted by a jury of voluntary manslaughter § 565.023.1 RSMo 1986.[2] He was sentenced by the court as a prior offender to ten years imprisonment with the Department of Corrections and Human Resources. Sections 558.016 and 557.036.4, RSMo 1986. We affirm.

II

The evidence adduced at trial, held in December 1988, most favorable to the verdict was as follows. Appellant was charged with second degree murder for the killing of the victim, Wilbur "Jerry" Auville, Jr. Auville, who desired to be called "Jerry" had known the appellant for approximately three weeks and was living sporadically with appellant and appellant's girlfriend, Gail Cutrell. The last time Jerry was seen by his family was May 11, 1988, and the last person to see him alive was the appellant. Jerry's mother spoke to him on May 11, 1988 and, at that time he was in good spirits beause he was to start a new job the next day. Jerry's mother became worried when he did not stop at her home on May 12, 1988. Although Jerry was living with appellant, he often went to his mother's house to shower, eat, and use the telephone. On May 12, 1988, Jerry's mother sent his sister down to appellant's abode and later she herself went to appellant's home on both May 12 and 13. On May 13, appellant told Jerry's mother that Jerry went fishing and that when he, Richards, called him he never answered. Richards also told Jerry's mother that when he went down to the location where Jerry was fishing, he found Jerry's broken fishing pole and his cigarette lighter. Richards showed Kim, the victim's sister, the broken fishing pole and lighter when she stopped by the appellant's house looking for the victim on May 13, 1988.

The victim, "Jerry" Auville, was reported missing by his mother on May 13, 1988. The victim's body was recovered from the Meramec river by a firefighter on May 15, in a very decomposed state. When it was found, the firefighter lifted an arm and left leg where they were entangled on a tree branch in the river, and brought the body upstream.

At trial, one of the chief witnesses for the state was Dr. Ronald Turgeon, a pathologist employed by the Medical Examiner's Office of St. Louis County. He testified to a number of facts. His duty was to ascertain the cause and manner of death. He testified that the cause of death is the injury which brings about the cessation of life and the manner of death is how that cause came about—whether homicide, suicide, natural causes, accident, or undetermined. Dr. Turgeon performed an autopsy upon the deceased. At the time of the autopsy, the body was "pretty badly decomposed." A tremendous amount of

1. Section 565.021 RSMo 1986 defines second degree murder:
   1. A person commits the crime of murder in the second degree if he:
   (1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or ...

2. Section 565.021 RSMo 1986 provides in pertinent part:

1. A person commits the crime of voluntary manslaughter if he:
(1) Causes the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause; or ...

swelling of the body had also taken place. The medical examiner, Dr. Turgeon, determined the cause of death to be drowning based on the facts that the deceased was "a young man, who at—the last time he was seen was perfectly healthy, and that, after autopsy, I found no evidence of natural disease, and he is found floating in the river." Dr. Turgeon found no trauma, contusions, fractures, or other causes to suggest the deceased had fallen and hit his head. He found no drugs in the deceased's system, but he did find present an .081 level of alcohol. He testified that one of the by-products of body decomposition is alcohol, so that Turgeon, the Medical Examiner, could not be sure how much, if any, of the alcohol was ingested. Dr. Turgeon testified that at first he concluded that the manner of death was "undetermined", but changed his decision several days after the autopsy, and concluded that death was caused by homicide after Officer McCrady informed him that the appellant had made a statement. Dr. Turgeon examined the neck area of the victim looking for objective evidence of trauma i.e. broken bones in the cartilages that surround the trachia. He testified that in some cases of trauma to the neck, these bones are often but not invariably fractured. There was no evidence of trauma to the bones or cartilages around the neck area. Furthermore, there was no evidence of hemorrhaging into the strap muscles—the muscles that "attach to your jaw into the neck and run down to your upper thorax", which often occurs when undue pressure is applied to the neck area. It was his opinion that the combination of body decomposition, together with the fact that the body was in the water where wildlife can nibble at the body, could conceal evidence of pre-mortem trauma. Dr. Turgeon testified that he determined that the manner of death was homicide based on the fact that the deceased was a "healthy male, who is found floating in the river, in addition to the fact that I got history of possible foul play." The medical examiner summed up his results of the autopsy by stating there was no "objective evidence of any kind of trauma or undue pressure."

Also testifying at the trial were appellant's girlfriend, Gail Cutrell, and several police officers. Appellant also testified on his own behalf. According to Gail's pre-trial statements, appellant and Auville began arguing and fighting on May 11, 1988 over Jerry's alleged statement that he wanted to have sex with Gail for $25. Apparently this argument lasted into the next day. On Thursday May 12, 1988, Appellant, Richards, told Gail that he "hurt" Jerry by punching him in the face and then "put" Jerry in the river.

On May 19, 1988 at approximately 7:00 p.m., Detectives Gary Berra and Zinselmeier questioned Gail and appellant. Over the course of approximately the next seventeen hours, they were separated and interrogated individually. Gail Cutrell gave a signed, written statement to the police which stated:

> On Thursday, May 12, 1988, Jeff [appellant] told me Jeff hurt Jerry, punching him in the face. Jeff said, 'Put Jerry at the river.' Jeff and Jerry fought because Jerry wanted to have sex with me. This happened on Wednesday, May 11, 1988.

> On Friday, May 13, 1988, Jeff told me I wasn't at home or sleeping during that day, Wednesday, May 11, 1988. He told —'Tell the police, when asked if I knew anything.'

Richards gave a taped statement, in which he stated that he and Jerry had a fight on the river bank, that he grabbed him by the neck, that he kicked him in the river and he never came back. This taped statement was played for the jury. At trial, appellant, Richards, in his testimony, both on the motion to suppress and at trial, claimed his statement was not voluntary in that he was coerced by police threats of receiving the death penalty if he did not make a written statement. Both Gail and appellant testified at trial that their pre-trial statements were false.

After the evidence was presented, the jury was instructed. The instructions pertinent to this appeal are as follows:

## INSTRUCTION NO. 6

The following terms used in these instructions are defined as follows:

Serious physical injury.

Means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

Sudden passion.

Means passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation. MAI–CR3d 333.00.

## INSTRUCTION NO. 7

If you find and believe from the evidence beyond a reasonable doubt:

First that on or about Wednesday, May 11, 1988, at approximately 4:30 p.m., in the County of St. Louis, State of Missouri, the defendant caused the death of Wilbur Auville, Jr., by *asphyxiating* him, and

Second, that defendant knew or was aware that his conduct was causing or was practically certain to cause the death of Wilbur Auville, Jr., or that it was the defendant's purpose to cause serious physical injury to Wilbur Auville, Jr., and

Third, that defendant did not do so under the influence of sudden passion arising from adequate cause,

then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

If you do find the defendant guilty of murder in the second degree, you will return a verdict finding him guilty of murder in the second degree. (Emphasis added.)

MAI–CR3d 313.04.

## INSTRUCTION NO. 9

If you do not find the defendant guilty of murder in the second degree, you must consider whether he is guilty of voluntary manslaughter.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 11, 1988, in the County of St. Louis, State of Missouri, the defendant caused the death of Wilbur Auville, Jr., by *asphyxiating* him, and

Second, that defendant knew or was aware that his conduct was causing or was practically certain to cause the death of Wilbur Auville, Jr., or that it was the defendant's purpose to cause serious physical injury to Wilbur Auville, Jr., then you will find the defendant guilty of voluntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of voluntary manslaughter.

If you do find the defendant guilty of voluntary manslaughter, you will return a verdict finding him guilty of voluntary manslaughter. (Emphasis added.)

MAI–CR3d 313.08.

## INSTRUCTION NO. 11

If you do not find the defendant guilty of murder in the second degree, and you do not find him guilty of voluntary manslaughter, you must consider whether he is guilty of involuntary manslaughter.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 11, 1988, in the County of St. Louis, State of Missouri, the defendant caused the death of Wilbur Auville, Jr., by *asphyxiating* him, and

Second, that defendant recklessly caused the death of Wilbur Auville, Jr., then you will find the defendant guilty of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions,

you must find the defendant not guilty of involuntary manslaughter.

In determining whether the defendant recklessly caused the death of Wilbur Auville, Jr., you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances. MAI–CR3d 313.10.

After the jury was instructed and closing arguments made, the jury retired and found appellant guilty of the lesser offense of voluntary manslaughter. Section 565.-023 RSMo 1986. After his motion for a new trial was overruled, and allocution granted, appellant was sentenced to ten years. This appeal followed.

### III

On appeal, appellant contends the trial court erred (1) because the verdict directors were improper in that they lacked a description of "means by which death was caused,", (2) because there was no evidence of voluntary manslaughter for the reason that there was no evidence of sudden passion to justify instructing the jury on voluntary manslaughter, and (3) in overruling appellant's motion to suppress his confession because it was not voluntarily made.

### IV

In his first point, appellant contends the trial court erred in submitting jury instructions No. 6 (Definitions), No. 7 (Second degree murder), No. 9 (Voluntary manslaughter), and No. 11 (Involuntary manslaughter) because the instructions were improper in that they lacked a description of "means by which death was caused" as required by MAI–CR 3d. In instructions 7, 9, 11, the cause of death was described as "by asphyxiating him"—which the appellant claims is inadequate to describe the means by which death was caused as required by the pattern instructions.

■ Appellant was charged with second degree murder. Instruction No. 7 was the verdict director for second degree murder. He was not found guilty of that offense, but of voluntary manslaughter. Appellant complains that the instruction failed to define adequate cause. The law is quite clear that a defendant cannot complain of instructional error on an offense for which he was not convicted. *State v. Blackmon,* 664 S.W.2d 644, 650 (Mo.App.1984); *State v. Cook,* 428 S.W.2d 728, 732 (Mo.1968); *State v. Frank,* 639 S.W.2d 209, 211 (Mo. App.1982). Instructional errors mandate reversal only when the defendant has been prejudiced. *Blackmon,* 664 S.W.2d at 650; *State v. Davis,* 608 S.W.2d 437, 441 (Mo. App.1980). In the case at bar, the defendant was convicted of voluntary manslaughter under the specific wording of instruction No. 9. Since the defendant was not found guilty by a jury under instructions No. 7 or No. 11, there is no prejudice.

The appellant claims that Instruction No. 9 did not conform to MAI–CR3d 313.08 and the term "asphyxiation" is an ambiguous description of the cause of death and thus is not a proper form for describing the "means by which death is caused." The prejudice, appellant claims, is two-fold. First, relying on *State v. Morris,* 564 S.W.2d 303, 309 (Mo.App.1978), he contends that the state did not have to prove beyond a reasonable doubt the corpus delicti, i.e. (1) the death of a human being, neither self-inflicted, nor the result of natural causes, or accident, and (2) the criminal agency of another. Second, by failing to describe adequately the means by which death was caused, the court erroneously permitted the jury to find appellant guilty whether it believed that the victim was strangled, smothered, knocked unconscious, or merely drowned.

■ Whether or not the instructions inform the jury what constitutes the offense charged is to be determined by the meaning of the language used in those instructions. *State v. Ogle,* 627 S.W.2d 73, 76 (Mo.App.1981). Words are not to be defined in an instruction unless specifically authorized by MAI–CR. See MAI–CR3d 333.00, Notes on Use 2f. It is fundamental

that the verdict directing instruction must require a finding of all the facts necessary to constitute the offense charged; thus, the instructions must cover all the essential elements of the offense charged. *Ogle*, 627 S.W.2d at 76.

■ MAI–CR3d 313.08, the pattern instruction on voluntary manslaughter instructs the jury to find inter alia;

First, that (on) (on or about) [date], in the (City) (County) of ___, State of Missouri, the defendant caused the death of [name of victim] by [Describe briefly the means by which death was caused, such as "shooting," "stabbing," "striking," etc.] him, and

In the case at bar, instruction No. 9 informed the jury that if it believed that appellant caused the death of Jerry Auville by asphyxiating him, it should find appellant guilty. Asphyxiation is defined as "Apparent death, ..., in living organisms due to lack of oxygen." Black's Law Dictionary 104 (5th ed.1979). Asphyxiation is a non-technical term that can be easily and readily comprehended by the jury and gives the jury a correct concept as to the cause of death. The use of the term asphyxiation is not a deviation from MAI–CR3d.

The appellant relies upon *State v. Holtkamp*, 588 S.W.2d 183 (Mo.App.1979) in which this court upheld the validity of the instruction where the words "by suffocating her" were inserted in the blank for the cause of death in MAI–CR2d 6.08. Appellant's contention in that case was that the instruction should have been clarified by adding the instrumentality of suffocation such as "with his hand" or "with a pillow". The court rejected this contention. At the time of *Holtkamp*, the approved pattern instruction read "such as shooting, stabbing, cutting, or striking, *without further description*" (emphasis added). MAI–CR2d 6.08. The court stated that "this phrase makes clear the drafter's desire for brevity." *Holtkamp*, 588 S.W.2d at 188. This phrase "without further description" was deleted from MAI–CR3d. See MAI–3d 313.08 and 313.10. The deletion of this phrase gives the trial court discretion as to the term describing the cause of death

whether "shooting" or "stabbing" or any other such term. In the case at bar, we conclude that under MAI–CR3d 313.08 "asphyxiation" is sufficiently descriptive of the cause of death. The important consideration is the "cause of death" not the particular manner by which the death was caused.

Furthermore, the appellant claims that by allegedly failing to describe the means by which death was caused, the state did not have to prove the *corpus delicti* of the crime. However, the verdict director was clear that if appellant's conduct or action caused the victim to be asphyxiated then the jury could reasonably find that appellant was guilty of the offense of voluntary manslaughter. Thus, the court did not err in giving the instruction.

■ In the argument portion of his brief, appellant, relies upon *State v. Priest*, 660 S.W.2d 300 (Mo.App.1983) and *State v. Morris*, 564 S.W.2d 303 (Mo.App.1978). He argues that the state must establish the *corpus delicti* by proving beyond a reasonable doubt "that the death was neither self-inflicted nor the result of natural causes or accident." Initially, we note that an appellate court will not consider on appeal issues in the argument portion of the brief if they are not included in the point relied on. *State v. Walker*, 639 S.W.2d 854, 861 (Mo.App.1982). Regardless of the procedural point, the cases relied upon by appellant are distinguishable. In both *Priest* and *Morris*, all of the evidence was circumstantial. In the case at bar, there is direct evidence of appellant's guilt by the statements of Gail and the appellant himself by which the jury could conclude evidence of guilt.

We have reviewed the entire record on appeal, and we find that there is sufficient evidence to support the jury's verdict.

## V

In his second point, appellant contends that the trial court committed reversible error by instructing the jury on voluntary manslaughter because there was no evi-

dence of "sudden passion" to justify the court's instruction.

The trial court is obligated to instruct the jury on voluntary manslaughter as a lesser included offense only if there is an evidentiary basis to support a conviction on that charge. § 556.046.2 [3] RSMo 1986. Thus, the defendant's manslaughter conviction cannot stand unless there is some evidence of "sudden passion arising from adequate cause" on the record. MAI–CR3d 313.08.

■ In the case at bar, the jury could find that there was substantial evidence of sudden passion arising from adequate cause. Both appellant's statement and the statement of his girlfriend, Gail, are sufficient substantial evidence for the jury to conclude that the victim, Jerry Auville, and appellant were down by the river when a fight broke out between them. The fight was allegedly over the victim's remark that he wanted to "sleep" with appellant's girlfriend for $25.00. Apparently in the course of the fight, appellant "put" the victim into the river. There was sufficient evidence of "sudden passion arising from adequate cause" to justify the submission of the voluntary manslaughter instruction to the jury.

### VI

In his third point, appellant claims the trial court erred in overruling appellant's pre-trial motion to suppress his confession because it was not voluntary and thus lacked reliability. Appellant contends he was interrogated for 18 hours, deprived of sleep, badgered throughout the night, denigrated as a liar, and threatened with the gas chamber before he made his confession.

■ A defendant is denied due process if his conviction is founded upon an involuntary confession. *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964); *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986). The test for "voluntariness" is whether under the totality of the circumstances defendant was deprived of his free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. *Lytle*, 715 S.W.2d at 915. On appeal, we must determine whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given. *Lytle*, 715 S.W.2d at 915; *State v. Hughes*, 596 S.W.2d 723, 727 (Mo. banc 1980). Conflicts in the evidence are for the trial court to determine, and we defer to the trial court's superior position from which to determine the reliability and credibility of a confession. *Lytle*, 715 S.W.2d at 915; *State v. Buckles*, 636 S.W.2d 914, 924 (Mo. banc 1982).

■ At the suppression hearing, Detective Nisbet testified that defendant was given his *Miranda* warnings and voluntarily waived those rights. While this is not dispositive of the voluntariness issue, it is a consideration. *Lytle*, 715 S.W.2d at 915. Detective Nisbet testified that, contrary to appellant's claims, during his eighteen hours in custody appellant slept approximately eight hours and ate regular meals. According to the detective's testimony, the appellant was taken into custody around 7:00 p.m. on May 19, 1988. On the way back to police headquarters, the detectives stopped at Burger King where the appellant ate. The appellant then ate again in the early morning hours of May 20, 1988. On May 19, 1988, the police questioned the appellant only for a very short time and they left him alone to think over his statements. During this time, appellant was given a blanket and allowed to sleep. After his initial interrogation, lasting forty-five minutes, his only contact with police officers until approximately 11:00 a.m. on May 20, 1988 was that they checked on him twice an hour. The appellant was interrogated by police on May 20, 1988 from ap-

---

**3.** Subsection 2 of 556.046 RSMo 1986 reads as follows:

2. The court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.

proximately 11:00 a.m. until he gave his statement sometime before 1:00 p.m. During this time the detectives were not in uniform and were unarmed. Furthermore, the detective testified that the appellant was not threatened and was allowed to use the restroom facilities. Detective Nisbet testified that appellant was not promised anything, nor psychologically or physically pressured. Under the circumstances, we cannot conclude that the trial court abused its discretion in holding that the confession was not involuntary.

Having read the entire record, briefs, and authorities relied upon by appellant, we conclude that there was sufficient substantial evidence to support the trial court's finding that the statement of appellant was voluntarily made. The fact that the trial court could have arrived at a contrary conclusion is irrelevant. *Lytle*, 715 S.W.2d at 915–16. Deferring to the trial court's determination of credibility and resolution of the conflicts in the evidence, the record supports a finding that the state met its burden of proving that the confession was voluntarily given.

We have read the entire 700 page transcript, the briefs of the parties, the authorities relied upon and the facts, arguments and contentions of the appellant and conclude that there is no prejudicial error. The judgment is therefore affirmed.

Judgment affirmed.

CARL R. GAERTNER, P.J., and STEPHAN, J., concur.