**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Jerry Bret HOLMES,
Defendant–Appellant.**

**No. 16388.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 11, 1990.

No appearance for plaintiff-respondent.

Samuel J. Short, Jr., Stockton, for defendant-appellant.

MAUS, Judge.

As the result of an incident on the night of December 24, 1988, Deputy Sheriff Don De Jager issued to defendant, Jerry Bret Holmes, a Uniform Complaint for "C&I Driving" and a Uniform Complaint for Driving While Intoxicated, First Offense. Subsequently, the prosecuting attorney filed an information charging that the defendant committed the class A misdemeanor of resisting arrest by Deputy De Jager for the foregoing offenses. § 575.150. The court dismissed the complaint for "C&I Driving" for failure to state an offense. In a jury-waived trial, the charges of Driving While Intoxicated and Resisting Arrest were tried to the court. The court observed that there was no blood test, breathalyzer test or other sobriety tests, and found "[i]n combination with physical scuffle and the effects of a person being in a

scuffle, Court believes there's not sufficient evidence to convict of DWI." The court found the defendant guilty of resisting arrest and sentenced him to imprisonment for 30 days in the county jail and fined him $250. The defendant appeals.

The following is an outline of the testimony of Deputy De Jager. At about 10:30 p.m. he was driving north on Highway 39 to investigate a complaint of loud noise from a party being held at Campbell's Ford on Sac River, three or four miles north and west of Greenfield. He met and passed three southbound vehicles. The last vehicle, a pickup truck, was following the preceding vehicle very closely. Until he observed otherwise, the deputy thought the pickup was being towed. In his rearview mirror, the deputy saw the pickup pass the preceding vehicle in what the deputy considered to be an erratic manner. Deputy De Jager decided to stop the pickup and give the driver a "talking to". He turned around and, by activating his red lights, stopped the pickup which was driven by the defendant.

The defendant stopped in the parking lot of a church. The deputy parked with the right front of his car near the left rear of the pickup. The defendant was out of the pickup by the time the deputy got out of his car. The deputy approached the defendant and asked for his driver's license. The defendant refused until the deputy told him why he was stopped. De Jager told him he was stopped for careless passing and following too closely. The deputy smelled alcohol on the defendant's breath, saw he was having trouble getting his driver's license from his billfold and "was very excited, very abusive, languagewise". The deputy twice asked the defendant if he had been drinking. The defendant did not answer. Deputy De Jager then "told him he was under arrest for driving while intoxicated."

The deputy then put his hand on the defendant's shoulder to turn the defendant toward his truck preparatory to placing handcuffs on the defendant. The defendant shoved the deputy backwards. The deputy's subsequent testimony included the following:

"Q. Okay. And what happened next?

A. I turned him around towards the truck—I grabbed him again, by both shoulders, and turned him towards the truck. And I took my handcuffs, and when I reached for his left hand, that is when he swung around with his right.

Q. Did he hit you?

A. Yes, he hit me in the jaw."

The deputy swung the defendant to the ground and, with the assistance of the deputy's brother, Howard De Jager, handcuffed the defendant's arms behind his back. The defendant was taken to the county jail. The defendant kept using abusive language, screaming and hollering. After a scuffle at the jail, the defendant was placed in the "drunk tank", a bare cell, where he went to sleep on the floor.

Howard De Jager was a truck driver. He was riding with his brother to pass the time. In general, he confirmed the testimony of his brother. He didn't get out of the car at first. He could see his brother approach the defendant. The defendant had his billfold out. The defendant shook his finger in his brother's face. He saw the deputy point to the defendant's hand and the pickup. Howard's testimony continued:

"A. Okay. And then, he took ahold of his hand, and laid it on the pickup bed, and Bret pulled it back off. And then, he reached again, and laid it up there; and that time when he came back, why, he came back real quick, like he was going to try to elbow him. And then, my brother caught his hand, and then, I guess,—don't really know how it all happened, but anyway I seen him swing around. He kind of swung around and fell to the ground. Well, I decided, at that time, he needed some help. So, I got out to go to the car. When I got over there, he had the cuff on one hand, but he couldn't get the other one around behind his back. And I helped take his other arm, and put around behind his back so he could get the cuff on."

After the defendant was placed in the rear seat of the patrol car, Howard heard his brother tell the defendant he was under arrest and read him "his rights". Howard didn't remember if his brother said for what offense the defendant was arrested.

The following is a sketch of the relevant testimony of the defendant. On the evening in question, he learned of a party at Campbell's Ford. He went out about 9 p.m. There was a large bonfire and a small group of young men. The defendant had no intoxicants before reaching the party, where he had two beers. When he was stopped in the church yard, he repeatedly asked the deputy why he was stopped and the deputy refused to tell him. He said at that point the deputy tried to slap a cuff on his left hand. He said he was in shock and couldn't figure out what was going on. He said he did not try to strike the officer but he did push the officer when he was trying to put the cuffs on. He said he "flinched". He said it hurt when the cuffs hit his arm. He said he wasn't resisting, but it was his reflexes. He was not told he was under arrest or what he had done wrong until the next morning. He denied being intoxicated and using abusive language.

Deputy De Jager said that he did not ask the defendant to take a breathalyzer test because "[t]here was no chance to". He performed no sobriety tests because it was his opinion the defendant would not cooperate. The deputy admitted he made a false affidavit that he had asked the defendant to submit to a chemical test and he had advised the defendant of the possibility of revocation. The deputy said he signed the affidavit "[b]ecause I had no chance to give him the Breathalyzer". The deputy testified that in his opinion the defendant was intoxicated. Another deputy sheriff who saw the defendant upon his arrival at the jail, testified the defendant smelled strongly of intoxicants and was belligerent and forceful. A highway patrolman who was there said the defendant was "very violent, very resistive", his eyes were glazed with a wild look in them and in his opinion the defendant was intoxicated. Two young men who were at the party did not see the defendant drink anything and said he was not intoxicated. A third young man saw the defendant with one bottle of beer, but said he was not intoxicated. The judgment of the trial court has been noted.

The defendant's sole point is

"that there was no substantial evidence sufficient for the court to find beyond a reasonable doubt the defendant-appellant had knowledge that officer DeJager was making an arrest or that the defendant-appellant, Jerry Bret Holmes, used violence or physical force for the purpose of preventing the officer from effecting the arrest."

The defendant's argument to support this point is replete with inferences or conclusions he draws which are favorable to him and with references to favorable fragments of testimony. For example, he emphasizes Howard De Jager's testimony that "he heard his brother, Deputy DeJager, tell the Defendant–Appellant he was under arrest and give him the Miranda warning, but at no time did he hear him tell him he was under arrest for D.W.I., or what he was under arrest for." In this argument, the defendant ignores the obvious inference the deputy did tell the defendant he was arrested for driving while intoxicated before Howard De Jager got out of the patrol car. The argument misstates the evidence in that after the defendant was in the patrol car, Howard De Jager heard his brother tell the defendant he was under arrest, but didn't remember if he told him what for.

A further example is the following argument. "Deputy DeJager's brother, Howard DeJager, testified that at no time did he see the Defendant–Appellant, Jerry Bret Holmes, hit Officer DeJager, but that as Officer DeJager spun the Defendant–Appellant around, it appeared that the Defendant–Appellant might have pulled his elbow back to elbow the Deputy." This misconstrues and misstates the evidence. In addition to the testimony above cited, the testimony of Howard De Jager included the following:

"Q. Did you ever see Mr. Holmes hit your brother?

A. I really didn't—*I couldn't tell* if he hit him or not, but he swung like he was trying to or—I know he come back with his elbow real quick-like, and threw his hands up." (Emphasis added.)

In summary, the defendant's point and argument are based upon an erroneous view of the evidence.

"Conflicts in the evidence were for the trial court to resolve and we defer to the trial court's superior position from which to determine credibility." *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986).

"In a determination of the sufficiency of the evidence to support a conviction, all evidence tending to support the verdict must be considered as true, contrary evidence disregarded, and every reasonable inference supporting the verdict indulged." *State v. Wahby*, 775 S.W.2d 147, 154 (Mo. banc 1989).

Viewed in this light, the judgment of the trial court is supported by competent and substantial evidence.

HOGAN, C.J., and FLANIGAN, P.J., concur.