IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 STATE OF MISSOURI, )
 Respondent, )
 )
 v. ) WD83333
 )
 THOMAS EUGENE ANTLE, ) FILED: May 11, 2021
 Appellant. )
 Appeal from the Circuit Court of Randolph County
 The Honorable Frederick P. Tucker, Judge
 Before Division Two: Mark D. Pfeiffer, P.J.,
 and Alok Ahuja and Karen King Mitchell, JJ.
 Following a jury trial, Thomas Antle was convicted in the Circuit Court of

Randolph County of one count of statutory sodomy in the first degree and one count

of child molestation in the first degree. Antle appeals. He argues that the circuit

court abused its discretion by admitting the minor victim’s out-of-court statements

to four adults under § 491.075.1 Antle also contends that the circuit court erred by

excluding the testimony of his retained expert, who had concluded that flaws in the

techniques used during Victim’s forensic interview rendered that interview

unreliable.

 We reject Antle’s argument that the circuit court erred by excluding his

proffered expert testimony. We conclude, however, that the court applied an

incorrect legal standard in determining whether Victim’s extrajudicial statements

were admissible under § 491.075. We remand for the court to conduct the inquiry

 1 Unless otherwise indicated, statutory citations refer to the 2016 edition of the
Revised Statutes of Missouri, updated through the 2018 Cumulative Supplement.
required by § 491.075. If the circuit court determines that Victim’s statements were

erroneously admitted, it should then consider whether a new trial is warranted. If

the court determines that Victim’s statements were properly admissible under

§ 491.075, or that a new trial is unwarranted despite the erroneous admission of

some or all of Victim’s extrajudicial statements, it should certify a supplemental

record to this Court to permit us to finally dispose of the issue.

 Factual Background
 Antle was charged and convicted of first-degree statutory sodomy and first-

degree child molestation for putting his penis in the mouth of his three-year-old

victim, and for touching her vaginal area through her clothes. (Antle was charged

with two additional sexual offenses involving a different child victim, but was

acquitted of those charges.)

 Victim, who was eleven years old at the time of trial, testified that she was

not “able to remember today what happened to [her] when [she was] three.” She

could not remember Antle babysitting her, or anything that happened at his home.

She did remember talking to “a lady” about Antle and seeing “a lady” for counseling,

but not what she may have said to anyone about Antle. Victim remembered making

a t-shirt in counseling “to keep [her] bad dreams away,” but could not remember

what the bad dreams were about.

 Prior to trial, the circuit court conducted a hearing pursuant to § 491.075. It

ruled that the State could introduce out-of-court statements concerning Antle’s

alleged abuse made by Victim to her Father, to her Grandmother, to forensic

interviewer Holly Calvert, and to counselor Debbie Danner.

 At trial, Victim’s Father testified that during the summer of 2011, he was

sitting at the kitchen table while Victim and her older sister were playing in their

adjoining bedroom. Father overheard Victim, who was then three years old, tell her
sister that “her uncle Tommy had put his thing in her mouth.” Father testified that

 2
Victim and her sister referred to Antle as “Uncle Tommy,” although he is not their

uncle.

 Father immediately called Victim into the kitchen and asked her to repeat

what she said. Victim “acted a little shy about it but she repeated” what she had

said to her sister. Victim’s sister entered the kitchen “shortly after and basically

confirmed it.” (Victim’s sister also testified at trial that she was playing with

Victim in the bedroom when Victim told her, “Uncle Tommy stuck his pee pee in my

mouth.” Antle does not challenge the sister’s testimony on appeal.)

 Once Victim’s Mother got home from work, Father told Mother what Victim

had said. Father and Mother “decided to give it a little time and then [Father]

would ask” Victim about it again. When Mother asked Victim about the incident,

Victim “repeated the exact same thing a couple more times to [Father], her mother

and her grandma.”

 Grandmother testified that on one occasion she had picked up Victim and her

sister in her car. While they were driving, Grandmother asked the girls how things

were going. Victim’s sister responded that Antle had put his privates in Victim’s

mouth. Grandmother then asked Victim, who replied that “Tommy put his privates

in my mouth.” Grandmother asked if Victim had spoken to her parents, and Victim
responded, “I don’t want to talk about it.”

 Grandmother also testified that she saw Victim in her “nightmare shirt,”

which Victim had created with the assistance of her counselor “to keep Tommy out

of her dreams.” Victim’s counselor had written on the shirt, at the Victim’s

suggestion: “I’ll tell. Tommy don’t do that again.”

 Grandmother, Mother, and Victim went to the police within a week of

Victim’s disclosure to Grandmother. Forensic interviewer Holly Calvert

interviewed Victim at the Moberly Police Department. Calvert videotaped the
interview, and the recording was played for the jury during trial.

 3
 During the interview, Calvert asked if anyone had touched Victim “someplace

on her body that is bad or you don’t like or makes you feel weird?” Victim said,

“Uncle Tommy.” Calvert asked where Antle had touched Victim, and she responded

by pointing to her “girl parts.” Victim stated that Antle had touched her “girl” with

his hand, over her clothes, and that it had made her feel “funny.” Victim told

Calvert that this occurred when she was at Antle’s house, in his bedroom, laying on

his bed. No one else was there, as Victim’s older sister and Antle’s two children

were at the park.

 When Calvert asked if Antle said anything to Victim “about why he was

doing that,” Victim replied that he said “don’t tell anybody.” Calvert asked if Victim

did tell anybody, and she responded that she had told Mother and Father.

 Calvert asked Victim if Antle had done anything else to her that day. Victim

responded, “he just did the same thing,” and that “he does it all the time.”

 Victim told Calvert that Antle had not asked her to touch any part of his

body, and that no part of his body had touched her beside his hand. The only

contact was when he touched her “girl” with his hand. Calvert asked Victim what

she had told her mother that Antle had done; Victim responded, “he touched me

right there,” referencing her vaginal area.
 Calvert asked if Victim had ever seen Antle with his clothes off. Victim

responded affirmatively. When asked what she had seen, Victim referenced the

penis on a diagram of the male body. Victim then stated that Antle “put his private

in my mouth,” and that it had happened more than once. While Victim said she

could not remember what it felt like, she remembered thinking she needed to tell

somebody. Victim testified that she was choking and scared, and could not breathe,

while Antle’s penis was in her mouth. She drew a picture of a penis, and told

Calvert that Antle’s penis was blue. Victim stated that afterward Antle got her a

 4
soda and a snack. Victim said she told her sister and her sister’s friend what Antle

had done.

 Debbie Danner, Victim’s counselor, was deceased at the time of trial; her

deposition was read into evidence. In her deposition, Danner stated she started

seeing Victim in 2011 when Victim began experiencing behavioral changes after

disclosing the abuse, including tantrums, nightmares, difficulty following orders,

and changes in the way Victim played with other children. Victim indicated to

Danner that Antle had asked her to put her mouth around his penis.

 Victim also described to Danner certain activities “consistent with grooming

behaviors,” which Danner explained makes it more difficult for a child to disclose

abuse. Antle would give Victim “special treat[s],” such as candy or soda; treats she

would not be allowed at home. Danner testified that Victim was afraid to tell

Mother about the alleged sexual abuse because she thought Mother would be angry

at her for accepting treats from Antle. Victim also expressed concern that her

friendship with Antle’s daughter would be affected by her disclosure of the abuse.

 Danner also discussed the “anti-nightmare sleeping shirt” she made with

Victim to help combat her recent nightmares, which was a major focus of Victim’s

counseling. Victim had told Danner the words to put on the shirt.
 Danner related a specific occasion in June 2012 in which Victim stated that

Antle “had abused her because she was little and younger than other girls. She

identified herself that she’s becoming bigger, but she saw herself as more

vulnerable and that was part of the abuse occurring.”

 Antle retained Dr. Ann Duncan-Hively, a clinical psychologist, to testify as an

expert in his defense. Dr. Duncan-Hively had reviewed the forensic interview of

Victim conducted by Holly Calvert. Dr. Duncan-Hively was prepared to testify that,

during Calvert’s interview of Victim, only 26% of her questions were properly “open-
ended.” By comparison, Dr. Duncan-Hively concluded that 64% of Calvert’s

 5
questions were improperly “leading”. Dr. Duncan-Hively testified that other

questions Calvert asked “inserted” facts into the interview which Victim had not

previously offered, and that Calvert had given Victim improper “affirmations,”

which praised or positively reinforced Victim when she gave responses which

revealed abuse. Dr. Duncan-Hively concluded that Calvert’s interview techniques

were “clearly problematic” and rendered her interview of Victim “highly

contaminated.”

 Following a testimonial offer of proof from Dr. Duncan-Hively, the circuit

court excluded her testimony, based on its conclusion that she lacked adequate facts

and data to support the scoring system she had applied to Calvert’s forensic

interview, and the conclusions she had drawn from that scoring system.

 The jury convicted Antle of the two counts involving abuse of Victim:

statutory sodomy in the first degree in violation of § 566.062, RSMo Cum. Supp.

2010, and child molestation in the first degree in violation of § 566.067, RSMo Cum.

Supp. 2010. The circuit court sentenced Antle to twenty-five years’ imprisonment

for statutory sodomy, and ten years for child molestation, with the sentences to run

consecutively.

 Antle appeals.
 Discussion
 I.

 In Points I-IV, Antle argues that the circuit court abused its discretion in

admitting Victim’s out-of-court statements to her Father, Grandmother, forensic

interviewer Holly Calvert, and counselor Debbie Danner. Antle argues that the

court used the incorrect legal standard to determine whether the statements bore

sufficient “indicia of reliability” to be admissible under § 491.075. We agree.

 “The trial court's decision to admit hearsay testimony under section 491.075
is reviewed for abuse of discretion.” State v. Sprinkle, 122 S.W.3d 652, 658 (Mo.

 6
App. W.D. 2003) (citation omitted). “Although the trial court's evidentiary findings

warrant deference from this court, no deference is required where the law has been

applied in error.” State v. Porras, 84 S.W.3d 153, 156 (Mo. App. W.D. 2002) (citation

omitted). “‘[T]he trial court necessarily abuses its discretion where its ruling is

based on an erroneous interpretation of the law.’” State ex rel. Deckard v. Schmitt,

532 S.W.3d 170, 174 (Mo. App. W.D. 2017) (quoting Bohrn v. Klick, 276 S.W.3d 863,

865 (Mo. App. W.D. 2009)).

 “In general, out-of-court statements are not admissible as evidence,” J.M.G.

v. Juvenile Officer, 304 S.W.3d 193, 196 (Mo. App. W.D. 2009), because “criminal

defendants are entitled to confront witnesses against them under the Confrontation

Clause of the Sixth Amendment, made applicable to states through the Fourteenth

Amendment.” Sprinkle, 122 S.W.3d at 660 (citation omitted). However, “there are

exceptions to this rule. The Missouri legislature has created a hearsay exception in

child sexual abuse cases with section 491.075.” Id. (citation omitted). Section

491.075 “permits witnesses to testify regarding the out-of-court statements of a

child . . . victim [of certain criminal offenses including sexual offenses] if the

statements are shown to be sufficiently reliable.” Porras, 84 S.W.3d at 156. Section

491.075 provides in relevant part:
 1. A statement made by a child under the age of fourteen
 relating to an offense under chapter 565, 566 or 568, or 573 RSMo,
 performed with or on a child by another, not otherwise admissible by
 statute or court rule, is admissible in evidence in criminal proceedings
 in the courts of this state as substantive evidence to prove the truth of
 the matter asserted if:
 (1) The court finds, in a hearing conducted outside the
 presence of the jury that the time, content and circumstances of
 the statement provide sufficient indicia of reliability; and
 (2) (a) The child testifies at the proceedings[.]

 7
The proponent of a child’s out-of-court statement has the initial burden of making a

sufficient showing of reliability to render the statement admissible. Porras, 84

S.W.3d at 157.

 “To determine the reliability of a child's out-of-court statements for purposes

of Section 491.[0]75, we look to the totality of the circumstances.” State v. Ragland,

494 S.W.3d 613, 623 (Mo. App. E.D. 2016) (citation omitted). This totality-of-the-

circumstances test requires consideration of several non-exclusive factors, such as:

 (1) spontaneity and consistent repetition; (2) the mental state of the
 declarant; (3) lack of a motive to fabricate; and (4) knowledge of subject
 matter unexpected of a child of similar age. Other important factors
 include the lapse of time between when the acts occurred and when the
 victim reported them and the technique employed by the interviewer.
State v. Thompson, 341 S.W.3d 723, 729 (Mo. App. E.D. 2011) (citations omitted).

“The unifying principle is that these factors relate to whether the child declarant

was particularly likely to be telling the truth when the statement was made.” State

v. Lane, 415 S.W.3d 740, 749 (Mo. App. S.D. 2013) (citation and internal quotation

marks omitted). A child’s out-of-court statement may be admitted when it bears

“particularized guarantees of trustworthiness.” Porras, 84 S.W.3d at 157 (citation

and internal quotation marks omitted). Thus, the purpose of a hearing under

§ 491.075 is “to determine the reliability of the child’s out-of-court statements” by
looking at the “time, content, and circumstances” surrounding those statements.

State v. Timbs, 562 S.W.3d 404, 406 (Mo. App. E.D. 2018) (citation omitted).

 In this case, the circuit court did not conduct the “reliability” assessment

required by § 491.075, because it failed to apply the “totality of the circumstances”

analysis required by established caselaw. The court held a hearing to consider the

admissibility of Victim’s out-of-court statements on April 23, 2019. During the

hearing, and despite numerous objections by Antle’s counsel, the circuit court
repeatedly stated that the only inquiry required by § 491.075 was whether the adult

 8
witnesses to whom Victim made disclosures were “accurately repeating what the

child said.” The court explained that, under § 491.075, the court was required to

determine only

 whether the person that is repeating what the child said was in a
 position to document it to say this is what the child said several times
 and was always repeating specifically what the child said, or is the
 person that's repeating what the child said kind of changing it and
 kind of building it up and kind of exaggerating it. And if all that's the
 case then forget it, that's not coming in.
 Consistent with its understanding of the reliability inquiry required by

§ 491.075, the court stated that, because Calvert’s interview of Victim was

videotaped, the only question it needed to decide was “whether or not the video

accurately purports to depict what it purports to depict and that's it.” Once the

court determined that the video recording accurately depicted the child’s

statements, the court stated that would be “game over to the point that it goes to

the jury and then the jury decides if the child is telling the truth or not.” The court

stated that “videos are very very very easy.” “When you have a video you have the

actual statement of the child video-recorded. And how can that statement not be

reliable?”

 As noted above, our prior decisions hold that “the technique employed by the
interviewer” is an “important factor[ ]” in determining the reliability of a child’s out-

of-court statement. Thompson, 341 S.W.3d at 729 (citations omitted). At the

§ 491.075 hearing, Antle’s counsel stated that he was prepared to present expert

testimony from Dr. Duncan-Hively to establish that the questioning techniques

employed by the adults to whom Victim made disclosures rendered Victim’s out-of-

court statements unreliable. The circuit court stated that this testimony was not

relevant: “These issues about leading the child and suggesting answers and making

a statement not credible, I think that's completely an issue for the jury.”

 9
 [W]hat I'm saying is that is all fair game for the jury. The jury needs
 to decide, and if you have an expert that can say, you know, this is the
 correct procedure, the wrong procedure, you know, will result in less
 than credible information, or the child is saying what the child
 shouldn't say, that's why you use experts, to educate the jury on the
 proper way to question a child and they can see how the child was
 questioned, and they can decide if the child was credible or not
 credible.
 Similarly, when Antle’s counsel sought to cross-examine Calvert concerning

the techniques she used in interviewing Victim, the court sustained the State’s

objection that the testimony was not relevant. The court commented that such

issues were not “appropriate for a video foundation.”

 Following the § 491.075 hearing, the circuit court made docket entries which

found the testimony of Victim’s Father, Grandmother, and counselor Debbie Danner

concerning Victim’s extra-judicial statements, as well as the recorded interview by

Holly Calvert, to be admissible. The court found that the testimony of Father,

Grandmother, and Danner “carry an indicia of reliability as to the actual remarks of

the child under 14 in question, and as such is admissible”; the court also found that

the video recording of the forensic interview “is reliable as to what the child said

and as such is admissible.”

 The circuit court erred in admitting Victim’s out-of-court statements based

solely on its determination that the adult witnesses and video recording accurately

depicted what Victim had said. Section 491.075 requires the court to do more than

simply determine if a child’s out-of-court statements are being accurately reported.

Under the statute, the court must determine that the “time, content and

circumstances” of the child’s statements “provide sufficient indicia of reliability.”

The court failed to make that determination here. Because the circuit court relied

on a mistaken understanding of the test for admissibility under § 491.075, it abused

its discretion in ruling Victim’s statements to be admissible.

 10
 The State admits that the circuit court’s belief that § 491.075 only required it

to “determin[e] the accuracy of the [adult witnesses’] recitation of the child’s

statements” is contrary to our caselaw. The State suggests, however, that this

Court could conduct the § 491.075 inquiry on our own, and uphold the admission of

Victim’s extrajudicial statements on grounds different from those on which the

circuit court itself relied. We decline the State’s invitation to make these

evidentiary rulings as an original matter on appeal. First, the caselaw makes clear

that the assessment of the admissibility of a child’s out-of-court statements under

§ 491.075 is a fact-dependent, discretionary determination. Because of the fact-

specific and discretionary nature of the inquiry under § 491.075, we afford a

substantial degree of deference to the circuit court’s resolution of these evidentiary

issues. Determining the admissibility of statements under § 491.075 is not simply a

legal issue which we could decide in the first instance on appeal.

 In addition, because of its erroneous understanding of the analysis required

by § 491.075, the circuit court failed to make factual findings concerning the

circumstances which would govern the admissibility of Victim’s statements, such as:

the spontaneity and consistency of her statements; whether she had motives to

fabricate; the language and sexual knowledge reflected in her disclosures; the
manner in which she was questioned; and the lapse of time between the underlying

events and her various disclosures. Not only did the court fail to make findings

concerning the relevant historical facts but – equally important – the court failed to

assess how those circumstances impacted the trustworthiness and reliability of

Victim’s statements. Finding the facts, and assessing the effect of the

circumstances on the reliability of the child’s statements, are inquiries for the

circuit court in the first instance.

 Finally, it would be inappropriate to decide the reliability of Victim’s various
extrajudicial statements on the present record, because the circuit court limited the

 11
evidence which was presented at the § 491.075 hearing based on its erroneous

reading of the statute. Thus, although Antle offered to present expert testimony

concerning the suggestiveness of the questioning to which Victim was subject, the

circuit court held that such testimony was irrelevant to the § 491.075 inquiry.

Further, the court sustained objections which limited Antle’s ability to cross-

examine the forensic interviewer, Holly Calvert, concerning the interview

techniques she employed. Given that the circuit court refused to permit Antle to

develop a full factual record, it would be particularly inappropriate for this Court to

conduct the § 491.075 inquiry in the first instance on appeal.

 In State v. Crum, 617 S.W.3d 504 (Mo. App. W.D. 2021), a circuit court

denied a defendant’s motion to suppress evidence derived from the search of an

apartment based on an erroneous understanding of the law: the court mistakenly

believed that the burden of proof was on the defendant to show that another

apartment resident had not consented to the search. We refused to decide the

consent issue in the first instance on appeal, for reasons that are equally applicable

here:

 “It is the province of the trial court to determine what actually
 took place, and we defer to that determination.” “Therefore, when the
 trial court does not decide critical facts governing the issue of consent,
 we cannot usurp its role and make the determination ourselves.”
 “Instead, we must remand the case to allow the trial court to perform
 that crucial task.” Here, the trial court failed to engage in its function
 to determine whether Ms. Moore's consent was voluntarily given, and
 we will not substitute our own judgment on matters of credibility from
 a cold record.
Id. at 508 (quoting State v. Parkman, 517 S.W.3d 685, 690 (Mo. App. S.D. 2017);

additional citation omitted).

 Our conclusion that the circuit court relied on a fundamentally flawed

understanding of § 491.075 is not the end of the inquiry, however. “Even if the trial
court abuses its discretion in allowing evidence in, appellant must show the

 12
admission of the evidence was prejudicial to be entitled to relief.” Sprinkle, 122

S.W.3d at 658 (citation omitted).

 [W]e review the trial court, not just for mere error, but for prejudice,
 and will reverse only if the error was so prejudicial that it deprived the
 defendant of a fair trial. An error is not prejudicial unless there is a
 reasonable probability that the error affected the outcome of the trial.
State v. Shelton, 314 S.W.3d 769, 773 (Mo. App. E.D. 2009); see also Ragland, 494

S.W.3d at 622–23 (“[E]rror in admitting evidence is not prejudicial requiring

reversal unless it is outcome-determinative.” (citation and internal quotation marks

omitted)).

 The erroneous admission of Victim’s extra-judicial statements was plainly

prejudicial in this case. There was no physical evidence corroborating Victim’s

accusations against Antle. Moreover, during her trial testimony, Victim failed to

testify to any abuse by Antle whatsoever; instead, Victim testified that she did not

remember what Antle may or may not have done to her eight years earlier. Victim’s

lack of present recollection may be entirely understandable given her age at the

time of the underlying offenses. The fact remains, however, that the only evidence

of Antle’s guilt came from Victim’s out-of-court statements. Antle was plainly

prejudiced where the vast majority of those extrajudicial statements were admitted

under an erroneous legal standard.

 The circuit court’s application of an erroneous standard of admissibility does

not necessarily require a new trial. In numerous criminal cases in which a circuit

court has applied an erroneous legal standard to a pretrial evidentiary ruling, or

has failed to make a required admissibility determination, Missouri courts have

held that a limited remand, for determination of the evidentiary issue under proper

legal standards, is appropriate. If the circuit court determines on remand that the

challenged evidence was inadmissible under the proper legal standards, then a new
trial may be warranted. If, however, the court determines on remand that the

 13
evidence was properly admissible under the correct legal test, then it should certify

a supplemental record to this Court, to permit us to review the evidentiary rulings

on a full record.

 The Missouri Supreme Court ordered such a limited remand in State v.

Mitchell, 611 S.W.2d 211 (Mo. 1981). In Mitchell, the circuit court admitted into

evidence an inculpatory statement by the defendant, without determining whether

the statement was voluntary. The Supreme Court held that the circuit court had

erred by failing to decide whether defendant’s statement was voluntary. The Court

did not itself order a new trial, however. Instead, the Court held that, “[b]efore this

appeal can be finally determined, a supplemental hearing is required on the

voluntariness issue.” Id. at 214. The Court remanded to the circuit court for “[a]

full evidentiary hearing” and a determination of voluntariness. Id. The Court

directed that, if the circuit court found the defendant’s statement to be involuntary,

“the judgment shall be set aside and the trial court shall grant a new trial on all

issues, without the statement being admitted in evidence.” Id. On the other hand,

 [i]f the court finds and determines that the statement was voluntary,
 then it shall certify the transcript of the hearing and its determination
 and findings to this court to be made a part of the transcript in the
 cause for determination and disposition of the appeal upon the record
 as supplemented.
Id.

 The procedure adopted in Mitchell has been followed in later cases where a

circuit court has failed to make an evidentiary ruling based on the correct legal

standards. See, e.g., State v. Nebbitt, 455 S.W.3d 79, 88-89 (Mo. App. E.D. 2014)

(remanding where the circuit court failed to issue a ruling and to apply the proper

standard of proof on the defendant’s pretrial motion to suppress); State v. Smoot,

363 S.W.3d 108, 113 (Mo. App. E.D. 2011) (remanding where circuit court failed to
decide whether defendant’s inculpatory statements were voluntary); State v.

 14
Edwards, 30 S.W.3d 226, 231 (Mo. App. E.D. 2000) (same); State v. Day, 970 S.W.2d

406, 410 (Mo. App. E.D. 1998) (same); State v. Finster, 963 S.W.2d 414, 418-19 (Mo.

App. S.D. 1998) (ordering remand under Mitchell where no transcript of

suppression hearing was available).

 The same approach is warranted in this case. We accordingly remand the

case to the circuit court for it to conduct a supplemental hearing under § 491.075.

Following that hearing, the court must determine, under proper legal standards,

whether the extrajudicial statements made by Victim to her Father, Grandmother,

counselor Debbie Danner, and forensic interviewer Holly Calvert, bear “sufficient

indicia of responsibility” to be admissible. If the court determines that some or all

of the statements are inadmissible, the court must then determine whether a new

trial is warranted. If the circuit court determines that no new trial is warranted

following the supplemental hearing, it shall certify a supplemental record to this

Court, which will permit us to decide Antle’s first four Points based on the

supplemental record developed on remand.

 II.
 Because it would independently entitle Antle to a new trial, we separately

consider his fifth Point. In Point V, Antle argues that the circuit court abused its

discretion by excluding Dr. Ann Duncan-Hively’s testimony concerning purported

flaws in the techniques used by Holly Calvert in her forensic interview of Victim.

 Prior to trial, the State filed a motion in limine to exclude Dr. Duncan-Hively

from testifying about the questioning techniques and circumstances surrounding

Victim’s out-of-court statements. The circuit court ruled that Dr. Duncan-Hively’s

testimony was irrelevant and inadmissible unless the State “opened the door” by

eliciting testimony that the individuals who interviewed Victim had “scientifically

reliable” training or expertise.

 15
 Dr. Duncan-Hively made a testimonial offer of proof during trial. During her

offer of proof, Dr. Duncan-Hively testified that the interview protocol used by

Calvert, the Cornerstone Interview Protocol, is not a scientifically-based protocol

because “it doesn’t control the verbal behavior of the interviewer.” She also testified

that the use of explicit diagrams of male and female bodies at the outset of the

interview had the potential to contaminate the interview, particularly with respect

to sexual assault victims under the age of seven.

 Dr. Duncan-Hively explained that the “[n]umber one” thing a forensic

interviewer must avoid is “the use of leading questions”; interviewers should

instead ask “open-ended questions” that leave it to the interview subject to supply

factual details. Other types of inappropriate behavior by an interviewer would

include “affirmations” (where the interviewer praises or provides other positive

reinforcement to the subject when they disclose details of abuse) and “insertions”

(where the interviewer introduces factual details into the conversation which have

not previously been mentioned by the interviewee). Dr. Duncan-Hively gave as

examples of leading questions, “Were his clothes on or off?” and “Did any part of his

body touch you beside his hand?”

 Dr. Duncan-Hively testified that she assessed Calvert’s interview using her
own coding system, in which she analyzed “the number of times the adult

interviewer asks questions, and then [she] code[d] whether or not the question is

open-ended, affirmative, inserting or leading.” An interviewer’s question can be

given more than one code.

 Dr. Duncan-Hively testified that, based on her review, only 26% of the

questions Calvert asked during the Victim’s forensic interview were open-ended

questions, while 64% were leading. According to Dr. Duncan-Hively, the

Cornerstone Interview Protocol, under which Calvert was trained, permits no more
than 10% leading questions. Dr. Duncan-Hively stated that “anything over 20

 16
percent” leading questions meant the interview was “clearly problematic” and

“highly contaminated.”

 The circuit court asked Dr. Duncan-Hively for “the research that justifies the

accuracy of [her] coding system.” Dr. Duncan-Hively explained that her “coding

system simply is a scanner that goes down the transcript and says ‘this is a leading

question, this is an open-ended question.’” When the court asked Dr. Duncan-

Hively to identify the research “that says that what [Calvert] did caused an

unreliable interview,” Dr. Duncan-Hively cited generally to various reference books

concerning the trauma experienced by child abuse victims, and the investigation of

allegations of child abuse. Dr. Duncan-Hively explained that she decides what is

and what is not a leading question based upon her own research and expertise, as

well as the research of others, including how a leading question is “commonly

defined.” She then “arithmetically” determines the percentage of leading questions.

 Following the offer of proof, the trial court ruled that Dr. Duncan-Hively’s

testimony was inadmissible. The court explained:

 The question, of course, is the Daubert qualifications for an expert. . . .
 I think what Dr. Duncan has done is that she’s come up with a coding
 system, and the question is, is the coding system based on sufficient
 facts and data? Well, she came up with a coding system herself, which
 is fine, but then has she put it to scientific testing for accuracy as it
 would be compared to the kind of questioning that Holly Calvert did.
 And if she had, which I don’t think she had, I also don’t think her
 coding system was properly applied to the facts in this case because I
 think in large part of the way she defines leading questions. . . . I
 don’t think that her testimony satisfies the requirements of Daubert,
 so I’m not going to allow it.
 Section 490.065.2(1) provides:

 A witness who is qualified as an expert by knowledge, skill,
 experience, training, or education may testify in the form of an opinion
 or otherwise if:
 (a) The expert's scientific, technical, or other
 specialized knowledge will help the trier of fact to understand
 the evidence or to determine a fact in issue;

 17
 (b) The testimony is based on sufficient facts or data;
 (c) The testimony is the product of reliable principles
 and methods; and
 (d) The expert has reliably applied the principles and
 methods to the facts of the case.
The trial court’s decision to admit or exclude expert testimony under the statute is

reviewed for an abuse of discretion. State v. Loper, 609 S.W.3d 725, 735 (Mo. 2020);

State v. Boss, 577 S.W.3d 509, 516 (Mo. App. W.D. 2019).

 Although there is no “definitive checklist or test” for determining whether an

expert’s testimony is based on reliable principles and methods which were reliably

applied, relevant considerations include: whether the expert’s theory or technique

has been tested or subjected to peer review; the existence of standards or controls or

a known rate of error; and whether the expert’s technique or theory is widely

accepted in the scientific community. State ex rel. Gardner v. Wright, 562 S.W.3d

311, 317 (Mo. App. E.D. 2018) (citation omitted); see, e.g., State v. Contreras-

Cornejo, 526 S.W.3d 146, 154 (Mo. App. W.D. 2017) (finding no abuse of discretion

in exclusion of expert where the record reflected that the expert’s methods were not

widely accepted in the relevant professional community).

 In State v. Sloan, 912 S.W.2d 592 (Mo. App. E.D. 1995), this Court held that
a circuit court had abused its discretion by excluding testimony by Dr. Duncan-

Hively concerning an interviewer’s use of improper or suggestive techniques when

questioning a child sex-abuse victim. Id. at 597. Because of the erroneous exclusion

of her testimony, we reversed the defendant’s conviction in Sloan, and remanded

the case for a new trial. Id. In Sloan, the circuit court had excluded Dr. Duncan-

Hively’s testimony on the basis that her testimony constituted “‘a commentary on

the veracity of the witness, and this is always within the province of the jury.’” Id.

at 595. Thus, Sloan did not address the issue presented here: whether Dr. Duncan-
Hively used reliable principles and methods, and reliably applied those principles

 18
and methods, to reach her conclusion that Calvert’s interview of the Victim used

64% leading questions, and was therefore “highly contaminated,” “clearly

problematic,” and unreliable.

 Because he was the proponent of Dr. Duncan-Hively’s testimony, Antle bore

the burden of establishing that her expert testimony satisfied the foundational

requirements of § 490.065.2(1). Yet, when she was specifically questioned by the

circuit court concerning the basis for her system of “coding” forensic interviews, Dr.

Duncan-Hively testified that she employed “a scanner that goes down the transcript

and says ‘this is a leading question, this is an open-ended question.’” When the

circuit court asked for the research which supported Dr. Duncan-Hively’s opinion

that Calvert’s interview of Victim was “clearly problematic” and “highly

contaminated” because Calvert had used 64% leading questions, and an

unquantified number of “insertions” and “affirmations,” Dr. Duncan-Hively

responded with general citation to reference works in the field of child abuse

trauma and the investigation of allegations of child abuse. Dr. Duncan-Hively’s

testimony during the offer of proof suggested that her coding system was entirely of

her own creation, and applied her personal definitions of “leading questions,”

“insertions,” and “affirmations.” Her offer-of-proof testimony also failed to supply
the court with any specific research or data to support her core conclusion that the

level of leading and other improper questions which she had identified rendered

Calvert’s interview of Victim unreliable. In these circumstances, we cannot

conclude that the circuit court abused its considerable discretion by excluding Dr.

Duncan-Hively’s testimony.

 Separate from the lack of scientific support for the “coding” methodology she

employed, the circuit court could also properly conclude that Dr. Duncan-Hively’s

ultimate conclusions improperly commented on the credibility of Victim’s
statements during the forensic interview. As Sloan holds, it may be appropriate for

 19
a defendant to present expert testimony generally addressing proper and improper

techniques for conducting a forensic interview of child sex-abuse victims, and

concerning whether a particular interviewer complied with or departed from such

standards in particular respects. Dr. Duncan-Hively’s proffered testimony went

significantly further, however: she proposed to offer testimony that, because of

Calvert’s departures from proper interviewing techniques, her interview of Victim

was “clearly problematic” and “highly contaminated.” In its discretion, the circuit

court could conclude that such a specific assessment of the reliability of Victim’s

forensic interview improperly usurped the province of the jury to judge the

credibility of Victim’s statements.

 In child sexual abuse cases, two types of expert testimony are
 typically challenged: (1) “profile” testimony which describes behaviors
 and other characteristics commonly observed in sexual abuse victims;
 and (2) particularized testimony concerning the alleged victim's
 credibility. Although the trial court has great discretion in admitting
 the former, the latter usurps the province of the jury and, therefore, is
 inadmissible. In other words, an expert will not be allowed to proffer
 opinion testimony concerning a particular witness' credibility.
State v. Biezer, 947 S.W.2d 540, 541 (Mo. App. E.D. 1997) (citations omitted).

 Biezer recognized that testimony like that proffered by Antle can cross the

line between admissible generalized “profile” testimony, and inadmissible
“particularized” testimony.

 “A qualified expert may explain to the jury the dangers of implanted
 memory and suggestive practices when interviewing or questioning
 child witnesses, but may not opine as to a child witness's credibility.
 That leaves a troublesome line for the trial judge to draw – as the
 expert applies his or her general opinions and experiences to the case
 at hand, at what point does this more specific opinion testimony
 become an undisguised, impermissible comment on a child victim's
 veracity?”
 An expert's testimony regarding improper interviewing
 techniques in a child sex abuse case runs the real risk of commenting
 on the victim's credibility, which is clearly impermissible under
 Missouri law.

 20
Id. at 542-43 (quoting United States v. Rouse, 111 F.3d 561, 571 (8th Cir. 1997)); see

also State v. Cobb, 336 S.W.3d 201, 210-11 (Mo. App. S.D. 2011).

 In this case, Dr. Duncan-Hively proposed to go much further than simply to

explain proper and improper interviewing techniques, or whether Calvert had

followed or failed to follow such techniques in her interview of Victim. Dr. Duncan-

Hively intended to assign Calvert’s interview of Victim a numerical score, based on

Dr. Duncan-Hively’s personal “coding” system, and opine that, based on that score,

the results of the interview were “clearly problematic” and “highly contaminated.”

Under the Missouri caselaw prohibiting expert witnesses from offering opinions on

witness credibility, the circuit court acted within its discretion in excluding Dr.

Duncan-Hively’s testimony in this case.

 Point V is denied.

 Conclusion
 We reject Antle’s challenge to the circuit court’s exclusion of testimony from

Dr. Duncan-Hively. We conclude, however, that the circuit court applied an

incorrect legal standard in ruling that Victim’s out-of-court statements (to her

Father, Grandmother, counselor Debbie Danner, and forensic interviewer Holly

Calvert) were admissible under § 491.075. We accordingly remand the case to the

circuit court for the limited purpose of holding the hearing required by § 491.075(1),

and making a determination whether “the time, content and circumstances of

[Victim’s] statement[s] provide sufficient indicia of reliability.” If the circuit court

determines that some or all of Victim’s statements are inadmissible, it must then

determine whether a new trial is warranted. If the court fails to order a new trial,

it should certify a supplemental record to this Court, to permit this Court to resolve

Antle’s claims in Points I through IV based on the supplemented record.

 21
 Alok Ahuja, Judge
All concur.

 22